713 N.W.2d 817 (2006)
CITIZENS ADVOCATING RESPONSIBLE DEVELOPMENT, et al., Respondents,
v.
KANDIYOHI COUNTY BOARD OF COMMISSIONERS, Appellant. (A04-886), Respondent (A04-890),
Duininck Bros., Inc., Intervenor (A04-886), Appellant (A04-890).
Nos. A04-886, A04-890.
Supreme Court of Minnesota.
May 11, 2006.
*821 John E. Mack, Mack & Daby P.A., New London, MN, for Appellant Card.
Jay T. Squires, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for Respondent Kandiyohi Cty.
Donald H. Walser, Kraft, Walser, Hettig & Honsey, PLLP, Hutchinson, MN, for Respondent Duininck.
Mike Hatch, Minnesota Attorney General, Dwight S. Wagenius, Richard P. Cool, Assistant Attorneys General, St. Paul, MN, for Amicus Eqb.
Noah D. Hall, National Wildlife Federation, Ann Arbo, MI, Janette K. Brimmer, MN Center for Environmental Advocacy, St. Paul, MN, for Amici Nat'l Wild-Life Fed. and MN Center for Env. Advocacy.
Paul D. Reuvers, Jason J. Kuboushek, Iverson Reuvers, LLC, Bloomington, MN, for Amicus Ass'n of MN Counties.
Heard, considered, and decided by the court en banc.

OPINION
ANDERSON, PAUL H., Justice.
On July 29, 2003, respondent Kandiyohi County determined that an environmental impact statement (EIS) was not necessary for two gravel pit projects proposed by respondent Duininck Brothers, Inc. Following this determination, appellant Citizens Advocating Responsible Development (CARD), an environmental advocacy group, brought a declaratory judgment action in Kandiyohi County District Court in an effort to overturn the county's determination. CARD moved for summary judgment, which the court granted. The court then ordered that an EIS be completed for the gravel pit projects. The county appealed the decision, and the Minnesota Court of Appeals overturned the district court, concluding that there was substantial evidence supporting the county's decision. Citizens Advocating Responsible Development, et al. v. Kandiyohi County Bd. of Commissioners, 2005 WL 44823 (Minn.App.2005). CARD then sought review by our court, claiming that the requirement under Minn. R. 4410.1700 (2005) that the county review "cumulative potential effects" should be interpreted according to the definition of "cumulative impact" given in Minn. R. 4410.0200 (2005). CARD also argues that the county, with or without the correct cumulative potential effects analysis, did not fulfill its duty to adequately review the proposed projects' potential for causing significant environmental effects when making the EIS determination. We reverse the court of appeals and remand to the county so that it *822 may make a new EIS determination in conformity with this opinion.
Respondent Duininck Brothers, Inc. planned to open two new gravel pits, the Eagle Lake West pit in Dovre Township and the CA pit in Green Lake Township. Both of these townships are located within the county, which contains large gravel deposits and a significant existing gravel mining industry.[1] Under the county's zoning laws, gravel mining requires a conditional use permit and is thus subject to environmental review under the Minnesota Environmental Policy Act. Conditional use permits in the county are granted by the county board. The county was also the "Responsible Governmental Unit" (RGU) in charge of conducting the environmental review of Duininck's application required by the Minnesota Environmental Policy Act. See Minn. R. 4410.0500, subp. 2 (2005).
Duininck first applied for a conditional use permit to open the Eagle Lake West pit in 1998. Duininck later withdrew this application for reasons unrelated to this appeal, but resubmitted it in November 2001. The county denied the conditional use permit application on October 15, 2002, after receiving a recommendation to deny from the county planning board. Duininck then filed an application for a conditional use permit to mine a limited part of the proposed CA pit area.[2] The county board reviewed this application in December 2002, heard public comments, and ruled that an Environmental Assessment Worksheet (EAW) was required before the conditional use permit could be granted. By March 2003, Duininck had not yet submitted an EAW, so the county board denied the conditional use permit request.
In April 2003, despite having no conditional use permit applications pending, Duininck submitted EAWs for both the Eagle Lake West and the CA pit proposals. In response to the EAWs, several citizens sent letters raising various environmental concerns, the Minnesota Department of Natural Resources (DNR) sent a letter expressing its concern regarding the possible effects on groundwater, and the Minnesota Pollution Control Agency (MPCA) sent a letter regarding its dissatisfaction with the level of detail in the EAW and requesting additional clarification on several of the EAW items. The county followed up by consulting with the Well Division of the Minnesota Department of Health, the Kandiyohi County Director of Environmental Services, and by obtaining responses from Duininck on the areas of environmental concern. After reviewing the accumulated information, the county decided that neither proposal required an EIS.
The record before us contains documents entitled "Supplemental Submittal Response to Public Comments For: Environmental Assessment Worksheet" for the Eagle Lake West and CA pits. These documents appear to be the county's responses to public concerns regarding the environmental effects of the gravel pits and a general explanation of the county's EIS determinations regarding the pits. The record does not contain the minutes of any county board or planning board meeting at which the EIS determination was *823 discussed. After the county declined to order an EIS, Duininck submitted conditional use permit applications for the pits, both of which were granted in November of 2003.
CARD appealed to the district court under Minn.Stat. § 116D.04, subd. 10 (2004), for a declaratory judgment overturning the county's decision. CARD claimed that the county had not fulfilled its obligation to consider and weigh the environmental concerns noted by citizen groups, neighbors, and, to a certain degree, the MPCA and the DNR. These concerns included possible erosion, air pollution, and the insufficiency and inapplicability of the proposed mitigating efforts. CARD also claimed that the county failed to use the correct standard for analyzing the cumulative potential environmental effects of the gravel pit projects, and therefore impermissibly failed to consider whether the proposed gravel pits would have significant environmental effects in light of the fact that there are several other gravel pits in the area.
The district court reversed the county's decision and concluded that an EIS was required. The court found that the county had not sufficiently considered or responded to the environmental concerns raised by CARD, concerned citizens, the MPCA, and the DNR. The court then ordered that an EIS be completed. On appeal, the court of appeals reversed the district court. The court of appeals held that the county's decision was supported by substantial evidence and was not arbitrary or capricious. CARD appealed and we granted review.

I.
CARD alleges that the county did not use the correct meaning for "cumulative potential effects" and thus did not apply the appropriate standard in determining whether the proposed gravel pits had the potential to cause significant environmental effects. More particularly, CARD asserts that when the county made its decision it should have used the "cumulative impact" definition given in Minn. R. 4410.0200 for "cumulative potential effects." We disagree. Our analysis of the framework and language of chapter 4410 leads us to the conclusion that the definition for "cumulative impact" in Minn. R. 4410.0200 does not apply to "cumulative potential effects" as used in Minn. R. 4410.1700.

A. Overview of the Minnesota Environmental Policy Act
The Minnesota Environmental Policy Act (MEPA) requires that governmental agencies contemplating taking action (e.g., issuing a conditional use permit) on a proposed project must first consider the project's environmental consequences.[3] Minn. Stat. § 116D.04, subds. 1a(d), 2a (2004), Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency, 644 N.W.2d 457, 468 (Minn.2002). Chapter 4410 of the Minnesota Rules contains the rules for environmental review enacted by the Environmental Quality Board (EQB) pursuant to Minn.Stat. § 116D.04. There are two main types of environmental review under MEPA's rules: project-specific review, where a proposed project is reviewed to determine whether it has the potential to cause significant environmental effects; and generic review, where review is ordered by the EQB to study types of projects that are not adequately reviewed on a case-by-case basis. See Minn. R. 4410.1000, 4410.3800 (2005).
*824 The processes for project-specific and generic environmental review are different. For both processes, if an initial environmental review is needed, an RGU is designated to handle the review.[4] Minn. Stat. 116D.04, subd. 2a(c); Minn. R. 4410.0500 (2005). But with a project-specific review, the RGU first prepares an EAW, which is described in section 116D.04 as "a brief document which is designed to set out the basic facts necessary to determine whether an environmental impact statement is required for a proposed action." Minn.Stat. § 116D.04, subd. 1a(c) (2004); Minn. R. 4410.1000, subp. 1, 4100.0200, subp. 24 (2005). When preparing the EAW, the RGU applies certain criteria laid out in Minn. R. 4410.1700, subp. 7, to determine whether the project has "potential for significant environmental effects." Minn.Stat. § 116D.04, subd. 2a(c) (2004); Minn. R. 4410.1700, subp. 7 (2005). If, after reviewing the EAW, the RGU decides that the project does have the potential for significant environmental effects, the RGU is required to issue a "positive declaration" indicating that an EIS must be completed. Minn. R. 4410.1700, subps. 1, 3. An EIS is an exhaustive environmental review that the party proposing the project must conduct at its own expense. See Minn. R. 4410.2000, subp. 1; Minn. R. 4410.2300; Minn.Stat. § 116D.045.
For generic EIS determinations, the EQB is the default RGU, and no EAW is completed or used in determining whether a generic EIS is required. Minn. R. 4410.3800, subps. 5-6. The factors which must be considered by an RGU in determining whether a generic EIS is required are found in Minn. R. 4410.3800, subp. 5. These factors are different in number and type from the factors used for project-specific determinations. Compare Minn. R. 4410.3800, subp. 5, with Minn. R. 4410.1700, subp. 7.

B. Language in the "cumulative potential effects" and "cumulative impact" criteria
One of the criteria that an RGU must apply when deciding whether a proposed project has the potential to cause significant environmental effects is the "cumulative potential effects of related or anticipated future projects." Minn. R. 4410.1700, subp. 7(B). Chapter 4410 defines the term "cumulative impact" in Minn. R. 4410.0200, subp. 11,[5] but does not define the term "cumulative potential effects." Minn. R. 4410.0200, subp. 11. CARD maintains that the "cumulative impact" definition in subpart 11 should be used to define "cumulative potential effects."
In attempting to determine whether the "cumulative impact" definition should be applied to "cumulative potential effects," we look first to the plain meaning of the words as used in the rule. MBNA America Bank, N.A. v. Commissioner of Revenue, 694 N.W.2d 778, 780 (Minn.2005). We have noted that the "words of a statute are to be viewed in their setting, not isolated from their context." State v. Anderson, 683 N.W.2d 818, 822 (Minn.2004) (citing *825 Chiodo v. Bd. of Educ. of Special Sch. Dist. No. 1, 298 Minn. 380, 382, 215 N.W.2d 806, 808 (1974)).
"Cumulative impact" and "cumulative potential effects" are different terms, and the fact that "cumulative impact" is specifically defined in chapter 4410 would appear to indicate that the EQB, which authored chapter 4410, intended to give that term a special and nontransferable meaning. This conclusion is supported by the fact that the language providing the context for "cumulative potential effects" is significantly different from that surrounding "cumulative impact." Minnesota Rules 4410.1700, which articulates the criteria an RGU must use in determining whether an EIS is required for a specific proposed project, contains the term "cumulative potential effects," and reads as follows:
Subp. 7. Criteria. In deciding whether a project has the potential for significant environmental effects, the following factors shall be considered:
A. type, extent, and reversibility of environmental effects;
B. cumulative potential effects of related or anticipated future projects;

C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority; and
D. the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, including other EISs.
Minn. R. 4410.1700, subp. 7 (emphasis added). On the other hand, the term "cumulative impact" appears in Minn. R. 4410.3800, which contains the criteria that the RGU[6] must consider when deciding whether a generic EIS is warranted:
Subp. 5. Criteria. In determining the need for a generic EIS, the EQB shall consider:
A. if the review of a type of action can be better accomplished by a generic EIS than by project specific review;
B. if the possible effects on the human environment from a type of action are highly uncertain or involve unique or unknown risks;
C. if a generic EIS can be used for tiering in a subsequent project specific EIS;
D. the amount of basic research needed to understand the impacts of such projects;
E. the degree to which decision makers or the public have a need to be informed of the potential impacts of such projects;
F. the degree to which information to be presented in the generic EIS is needed for governmental or public planning;
G. the potential for significant environmental effects as a result of the cumulative impacts of such projects;
H. the regional and statewide significance of the impacts and the degree to which they can be addressed on a project-by-project basis; and
I. the degree to which governmental policies affect the number or location of such projects or the potential for significant environmental effects.
Minn. R. 4410.3800, subp. 5 (emphasis added).
CARD's plain-meaning argument that "cumulative potential effects" and "cumulative impact" are the same is in essence based on the fact that the terms "cumulative potential effects" and "cumulative impact" contain one common word (cumulative) *826 and two similar words (impact and effects). But this argument fails to recognize how the specific words are used in the respective subparts of chapter 4410. They are in fact embedded in two very differently worded criteria. In a project-specific EIS determination context, the RGU must consider "cumulative potential effects of related or anticipated future projects," while for a generic EIS determination the RGU must consider "the potential for significant environmental effects as a result of the cumulative impacts of such projects." Minn. R. 4410.1700, subp. 7(B), 4410.3800. subp. 5(G). When read in context, as they must be, the terms at least raise a question, if not a presumption, that they were not intended to be identical.
The foregoing conclusion is further supported when we look at the environmental review framework established by the EQB in chapter 4410. This framework indicates that the definition of "cumulative impact" given in Minn. R. 4410.0200 should not be used to define "cumulative potential effects" as CARD has asserted. As previously noted, the term "cumulative impact" appears in the criteria for generic EIS determinations, while the term "cumulative potential effects" appears in the criteria for project-specific EIS determinations. Minn. R. 4410.1700, subp. 7, 4410.3800, subp. 5(G). A generic EIS is an EIS ordered not because there is a specific project under consideration, but because the EQB has a particular broad environmental concern unrelated to a specific project. See Minn. R. 4410.3800, subp. 1. The generic EIS section of the rules begins with the statement "A generic EIS may be ordered by the EQB to study types of projects that are not adequately reviewed on a case-by-case-basis." Minn. R. 4410.3800, subp. 1 (emphasis added). It appears to us that the meaning of this section is clear  a generic EIS is intended to go further and review more than a project-specific EIS.
Furthermore, in accordance with the different purposes of the generic and project-specific EIS determinations, the generic EIS determination criteria are quite different from those used for project-specific EIS determinations. Compare Minn. R. 4410.1700, subp. 7, with Minn. R. 4410.3800, subp. 5. There are four project-specific EIS determination criteria and nine generic EIS determination criteria, and of the thirteen project-specific and generic EIS determination criteria, the only ones that are potentially comparable are the "cumulative impact" and "cumulative potential effects" criteria. Id. But as noted above, the language of the "cumulative impact" and "cumulative potential effects" criteria contains significant differences.
CARD and amici the National Wildlife Federation and the Minnesota Center for Environmental Advocacy point out that in regulations for the National Environmental Protection Act of 1969 (NEPA), 42 U.S.C. 4321-4700 (2004), the words "effects" and "impacts" are used interchangeably, and assert that we should interpret MEPA's regulations as using the words interchangeably as well. But NEPA's regulations contain a specific provision which states that "effects" and "impacts" are to be used interchangeably. 40 C.F.R. 1508.8 (2005).[7] There is no comparable provision in chapter 4410. Therefore, we conclude that MEPA and NEPA cannot be equated vis-à-vis their treatment of the terms "effects" and "impacts." Additionally, the fact that the governmental agency that composed NEPA's rules believed it was necessary to specify that "effects" and "impacts" were to be used interchangeably within NEPA's rules indicates that, without *827 such a specification, a use of "impacts" in one place and "effects" in another would be considered by many to be a meaningful difference.
CARD and amici the EQB, the National Wildlife Federation, the Minnesota Center for Environmental Advocacy, and the Minnesota Attorney General advance an additional argument in support of their interpretation of "cumulative potential effects." They point out that the EQB  both in its Guide to Minnesota Environmental Review Rules and as an amicus in this case  claims that it intended the "cumulative impact" definition to be used for the "cumulative potential effects" inquiry. Guide to Minnesota Environmental Review Rules, supra at 5. We give "considerable deference" to an agency's interpretation of its own rule, "especially when the relevant language is unclear or susceptible to different interpretations. * * * If a regulation is ambiguous, agency interpretation will generally be upheld if it is reasonable." St. Otto's Home v. Minnesota Dept. of Human Services, 437 N.W.2d 35, 40 (Minn. 1989). But as we have already indicated, the environmental review framework and the context in which the "cumulative impact" and "cumulative potential effects" terms are used in the rules is contrary to the EQB's interpretation.
When the plain meaning of a rule is contrary to an agency's interpretation, we cannot ignore the plain meaning by deferring to the agency's interpretation. Id.; see also Resident v. Noot, 305 N.W.2d 311, 312 (Minn.1981) (stating that we do not defer to an agency's interpretation of its own rule when the language employed or the standards delineated are clear and capable of understanding). Moreover, as will be shown in section II, the EQB's own rulemaking history does not support its argument that it intended the "cumulative impact" definition to be applied to "cumulative potential effects." While we understand that the EQB is concerned because its rules lack an explicit definition for "cumulative potential effects," the EQB cannot correct its failure to include a "cumulative potential effects" definition by importing an inapplicable definition from another section of the rules.
In sum, we conclude from the framework and language of chapter 4410 that the EQB envisioned a different type of inquiry for generic EIS determinations than for project-specific EIS determinations, and used different language  "cumulative impact" versus "cumulative potential effects"  for that reason. We further conclude that the definition of "cumulative impact" given in Minn. R. 4410.0200, subp. 11, does not apply to the project-specific "cumulative potential effects" criterion in Minn. R. 4410.1700, subp. 7(B). Based on the differences outlined above, we conclude that it would be reaching too far for us to hold that these differently worded terms, contained in different environmental review criteria, are intended to have the same meaning.

II.
As we stated above, the generic EIS "cumulative impact" definition in Minn. R. 4410.0200, subp. 11, should not be used to define a project-specific "cumulative potential effects" inquiry. But the fact that we have reached this conclusion does not end our inquiry. We still must determine the meaning of "cumulative potential effects."
At this point the county asks us to apply a very narrow definition, and in support of its position, refers to a definition of "related action" that has since been deleted from the rules.[8] CARD, on the other hand, *828 does not put forward an argument for a definition of "cumulative potential effects" other than its assertion that "cumulative potential effects" means the same as "cumulative impact." But both the county and CARD discussed not only the language of chapter 4410, but also evidence of legislative intent in their efforts to ascertain the meaning of "cumulative potential effects." We agree with both parties that it is necessary to consider both the language of chapter 4410 and evidence of legislative intent in order to ascertain the intended meaning of the cumulative potential effects criterion.

A. Legislative intent in creating the cumulative potential effects criterion
When the words of a rule are ambiguous, the intent of the rulemakers may be ascertained by considering other evidence.[9] In ascertaining legislative intent, we look to:
(1) the occasion and necessity for the law;
(2) the circumstances under which it was enacted;
(3) the mischief to be remedied;
(4) the object to be attained;
(5) the former law, if any, including other laws upon the same or similar subjects;
(6) the consequences of a particular interpretation;
(7) the contemporaneous legislative history; and
(8) legislative and administrative interpretations of the statute.
Minn.Stat. § 645.16 (2004). Therefore, we turn to the legislative and rulemaking record in an attempt to ascertain the EQB's intent when it created the "cumulative potential effects" criteria.
First, it is useful to consider the legislature's overall intent in passing MEPA and establishing MEPA's system of environmental review. Minn.Stat. §§ 116D.01 and 116D.02 emphasize the legislature's belief that environmentally sustainable policies are desirable and governmental bodies are to consider the environmental effects of their actions.[10] The legislature then specified several environmental goals for governmental action in order to accomplish this purpose. Minn.Stat. § 116D.02. These goals included that the state should "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "develop and implement a policy such that growth occurs only in an environmentally acceptable manner." Minn.Stat. § 116D.02, subd. 2(1), (3). But the legislature was also careful to acknowledge that these environmental goals must be balanced with "other essential considerations of state policy." Minn.Stat. § 116D.02, subd. 2.
To ensure that RGUs would take the foregoing environmental goals into account *829 when making decisions on which projects to approve, the legislature created the EAW and EIS review framework in Minn. Stat. § 116D.04. The EQB then fleshed out the EAW and EIS review procedures in chapter 4410 in accordance with the legislature's goals.[11] As previously noted, under Minn. R. 4410.1000, subp.1, the purpose of the project-specific EAW is to determine on brief review whether a given project could potentially cause significant environmental effects, and Minn. R. 4410.1700, subp. 7, provides the criteria to be used by an RGU when making this determination. Minnesota Rules 4410.1700, subp. 7's project-specific criteria essentially reflect common sense principles, and these principles indicate what the EQB, which created the rules, intended when it required consideration of "cumulative potential effects of related or anticipated future projects."
After consideration of the legislative history and the purpose of the environmental review rules, we conclude that the point of the "cumulative potential effects" criterion is to put the proposed project into context. The criteria aims to determine whether the project, which may not individually have the potential to cause significant environmental effects, could have a significant effect when other local projects already in existence or planned for the future are considered. This purpose recognizes the fact that the environment is a dynamic system wherein one action may have an effect on another, or when considered in conjunction with another. Therefore, with the EQB's general intent in creating the "cumulative potential effects" criterion before us, we proceed to determine what the EQB intended the scope of the cumulative potential effects review to be.

B. Scope of the cumulative potential effects inquiry
To determine the scope of a cumulative potential effects review, we first turn to the rule's language. Minnesota Rules 4410.1700 requires that an RGU making a project-specific EIS determination consider "cumulative potential effects of related and anticipated future projects." It is unclear from this language which projects are "related" or "anticipated future projects." In the initial version of chapter 4410, "related actions"[12] was defined *830 in Minn. R. 4410.0200, and a section of Minn. R. 4410.1700 explained that the "related action(s)" definition was to be used to delineate the scope of "cumulative potential effects of related or anticipated future projects."[13] Minn. R. 4410.0200,.1700 (1983). But the "related action(s)" definition and application sections were deleted in a 1988 revision of chapter 4410. Minn. R. 4410.0200 (1989). Thus, it is helpful for us to examine the rulemaking record to determine what the rulemakers intended the meaning of the terms "related and anticipated future projects" to be and to ascertain the effect of the deletion of the "related action(s)" definition and application sections. Minn.Stat. § 645.16(5) (stating that "the intention of the legislature may be ascertained by considering, among other things, `the former law, if any, * * *.'").
In its 1988 Statement of Need and Reasonableness (SONAR) deleting the definition of "related action(s)," the EQB stated that the term "related" as used in "cumulative potential effects of related or anticipated future projects" would retain the aspect of "similar geography and timing." 1988 SONAR 10.[14] This statement appears to indicate that a "cumulative potential effects" inquiry used for project-specific EIS determinations is more limited in geography and timing than the "cumulative impact" inquiry used for generic EIS determinations. In regard to timing, the RGU considers all "reasonably foreseeable future projects" when deciding whether a generic EIS should be ordered. Minn. R. 4410.0200, subp. 11. But for a project-specific EIS determination, the RGU considers "anticipated future projects"  an inquiry that is less speculative because it involves specific projects actually planned or for which a basis of expectation has been laid. Minn. R. 4410.1700, subp. 7(B).
As indicated by the 1988 SONAR, the geographic scope of a project-specific cumulative potential effects analysis is also more limited than that of a generic EIS cumulative impact analysis. The cumulative impact analysis does not establish limits on the geographic area of the outside projects to be considered. This lack of geographical limitation is consistent with the purpose of the generic EIS determination process  it is meant to be far-reaching, examining entire industries and their potential effects, the better to effectuate long-range planning for the regulation of such industries. The cumulative potential effects analysis, however, is more limited, because it establishes geographic limits, as discussed in the SONAR.
Accordingly, we conclude that a cumulative potential effects analysis is limited geographically to projects in the surrounding area that might reasonably be expected to affect the same natural resources  for instance, a nearby lake  as the proposed project. We conclude that this type of geographically limited inquiry is consistent *831 with the purpose of the project-specific EIS determination process  to alert a governing body to any potential significant environmental effects of a proposed project before the governing body takes action to approve or disapprove the project.
The county urges a nonspecific, narrow interpretation of "cumulative potential effects" or of "related" projects  one that is so narrow that the county concludes that it "properly evaluated the existence of related or anticipated future projects, and determined that none existed." This statement implies that the county's unspecified interpretation of the scope of cumulative potential effects review would not take into account other local gravel pits. We conclude, however, that such a limiting definition would be contrary to the EQB's intent. The legislature and the EQB have required RGUs to determine whether a proposed project would have significant environmental effects. The "cumulative potential effects" criterion requires consideration of other local projects because such projects could well contribute to the potential environmental effects of a proposed project. If a governmental body is allowed to strategically ignore pertinent local activities when conducting environmental review, the legislature's and EQB's intentions will not be fulfilled.
Additionally, the EQB claims that a narrow definition of "cumulative potential effects" such as the one suggested by the county was neither intended by the EQB nor has it been used by the EQB. We previously concluded that the EQB's claim that the "cumulative impact" definition should be used for the term "cumulative potential effects" is not supported by the plain language of the rules. Here, however, we conclude that the EQB's assertion regarding the intent behind the "cumulative potential effects" term is not contradicted by the language of the rules and therefore is entitled to deference. St. Otto's Home, 437 N.W.2d at 40 (setting forth the criteria for when we defer to an agency's interpretation of its own rule).
Moreover, the county's interpretation of the rule could lead to absurd results. Under such an interpretation, a reviewing body could simply ignore most other projects in the surrounding area of the proposed project, as if those other projects and their environmental consequences vanished from the map for environmental review purposes as soon as they were developed. In this case, the obvious candidates for cumulative potential effects analysis would be the several other gravel pits in the area of the proposed gravel pits. Had those pits been a natural occurrence  a feature of the local landscape  they would necessarily have been considered in the environmental review just as a lake or forest would be considered. It would be a strange consequence if the existing pits need not be considered in an analysis of the potential environmental effects of a proposed project simply because they were created by human beings rather than by the hand of nature. When a project is implemented and the land is developed, the changes become part of the environment  a benefit or a burden, to be considered when a new project comes into the area.
In essence, our analysis of the rules' language and framework and the legislative intent evidence indicates that the "cumulative potential effects" and "cumulative impact" criteria both require an RGU to examine whether a given project may have a significant environmental effect when considered in conjunction with other projects. The main difference between the two criteria is in the scope of the analyses. In considering the "cumulative potential effects of related or anticipated future actions" criterion, an RGU must take into account outside projects *832 that have the potential to cause significant environmental effects when considered in conjunction with the proposed project, but with a geographic and temporal scope limited as explained above.

III.
Having determined the criteria required by Minn. R. 4410.1700, subp. 7, for a project-specific "cumulative potential effects" inquiry, we now must decide the ultimate issue before us. That issue is whether the county's decision that the two proposed gravel pits did not have the potential for significant environmental effects was unsupported by substantial evidence, arbitrary and capricious, or based on an error of law. Minn.Stat. § 14.69 (2004). CARD and amici raise several environmental concerns which they claim were insufficiently considered by the county, including the projects' potential for significant environmental effects on air quality, groundwater, and soil erosion. CARD also claims that the county inappropriately weighed proposed mitigation of environmental problems and did not correctly consider potential cumulative potential effects. The district court agreed with CARD that the county had not taken a "hard look" at the relevant environmental concerns, as is required by our case law. Reserve Mining Co. v. Herbst, 256 N.W.2d 808, 825 (Minn.1977). The court of appeals overturned the district court, concluding that the county's examination was sufficient to support the county's negative EIS determination.
We review an agency's decision independently without according any special deference to the same review conducted by the district court or appellate court. Estate of Atkinson v. Minn. Dept. of Human Services, 564 N.W.2d 209, 213 (Minn.1997). But we do accord substantial deference to the agency's decision. Reserve Min. Co., 256 N.W.2d at 824. Our role when reviewing agency action is to determine whether the agency has taken a "hard look" at the problems involved, and whether it has "genuinely engaged in reasoned decision-making." Id. at 825. Agency decisions are reversed when they reflect an error of law, the findings are arbitrary and capricious, or the findings are unsupported by substantial evidence. Minn.Stat. § 14.69. Substantial evidence consists of: "1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than `some evidence'; 4) more than `any evidence'; and 5) evidence considered in its entirety." Reserve Min. Co., 256 N.W.2d at 825. Moreover, an agency ruling is arbitrary and capricious if the agency (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise. In re Charges of Unprofessional Conduct Contained in Panel File 98-26, 597 N.W.2d 563, 567 (Minn.1999).
Before examining the county's deliberations, we must first determine which party had the initial burden of proof. The rules promulgated under the Minnesota Administrative Procedure Act[15] state that "The party proposing that certain action be taken must prove the facts at issue by a preponderance of the evidence, unless the substantive law provides a different burden or standard." Minn. R. 1400.7300, subp. 5 (2005). Therefore, at the agency *833 level, it was Duininck's burden to show that there are no potential significant environmental effects. Id.
But unsupported fears do not require a full-blown investigation. As the court of appeals has correctly held, "[an RGU] cannot be compelled to prepare an EIS on the basis of speculative factors." Iron Rangers for Responsible Ridge Action v. Iron Range Res., 531 N.W.2d 874, 881 (Minn.App.1995); see also White v. Minn. Dept. of Natural Res., 567 N.W.2d 724, 735 (Minn.App.1997) ("Appellants cannot avoid summary judgment by producing evidence of a mere possibility of harm to rare and sensitive plants."). Additionally, on appeal, "the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety." Reserve Mining Co., 256 N.W.2d at 825. With this balance of burdens in mind, we turn to examine the concerns raised by CARD  the potential of the two gravel pits to cause significant environmental effects on groundwater, air pollution, and soil erosion; the insufficiency of proposed mitigation of environmental problems; and the cumulative potential effects of the projects.

A. Groundwater
The DNR in its letter and several citizens in their letters expressed concern about the potential effect of the proposed gravel pits on the local groundwater. In the area of the proposed pits, gravel and sand in the soil filter the water seeping into the ground, removing suspended solids before the water reaches the groundwater level. At the Eagle Lake West and CA locations, groundwater is estimated to be 60 feet and 80 feet below ground level respectively. Duininck's stated intention is to leave a minimum of 25 feet of soil above the groundwater in both locations. Nevertheless, the removal of 35 to 55 feet of gravel would inevitably deprive the area of some of its groundwater filtration. This is of special concern with regard to the Eagle Lake West pit because, according to a 1980 hydrological budget, nearby Eagle Lake receives about 22% of its water from groundwater seepage.[16] Additionally, many residents in the area get their water from wells. CARD argues that the county did not sufficiently consider that removal of the gravel layer could result in significant pollution of the groundwater, with serious consequences for Eagle Lake and for local well water.
We conclude that the concerns raised by the DNR in its letter and the hydrological budget did raise enough of an environmental question to require examination by the county during the EIS determination process. But we also conclude that there is sufficient evidence supporting the county's determination that pollution of groundwater would not be a problem. Kandiyohi County's Director of Environmental Services stated that he did not believe the proposed pits would have a negative effect on the groundwater. Additionally, a representative of the Well Division of the Minnesota Department of Health stated that the gravel mining should have no effect on wells in the area because the mining would be above the water table. We conclude that the opinions of these two experts are sufficient to provide a basis of substantial evidence for the county's determination that the proposed projects did not create the potential for a significant environmental effect on the groundwater.

B. Air Pollution
CARD also claims that the county insufficiently considered concerns expressed *834 by some citizens regarding air pollution via dust, increased traffic, and noise. The concerns regarding air quality were mostly speculative (e.g., "we are concerned about possible dust and odors."). Additionally, as the county points out, the MPCA made no mention of air pollution concerns in its letter regarding the EAW.
Nevertheless, the county addressed air pollution concerns in its EIS determination supplement, pointing out that Duininck's equipment would be subject to emission control regulations and noting that the MPCA did not consider the projected traffic increase to be problematic. Additionally, Duininck included in the EAW its estimations on the traffic increase, which estimations provided a basis for the county's decision. Regarding dust and noise, the EAW states that the county's Zoning Ordinance provides standards for mitigation of dust and noise that would be discussed during the permitting process. We conclude that, because no specific evidence or substantive allegation is put forward regarding air pollution, the MPCA did not express any concerns, and there appear to be pre-existing standards for dust, traffic, and noise control, the county's decision that air pollution concerns did not mandate an EIS is supported by substantial evidence.

C. Erosion
CARD also alleges that the county insufficiently addressed the concern of some citizens and the DNR that, because some of the soil in the area of the proposed projects is classified as erodible, the mining could cause harmful erosion. The county responds that the proposed plan involved using the overburden to create berms to hold off any surface runoff from adjacent land. Additionally, Duininck stated in its EAW that it would take steps to direct all water on the sites into the pits, which would prevent any erosion of soil onto other properties. Duininck also stated that it would install erosion control measures as needed. Moreover, should Duininck fail to comply with its submitted plan, the EIS determination would no longer apply, as Duininck would be outside the parameters of the authorized project. The citizen concerns here appear to lack specificity and provide no explanation of how Duininck's proposed plan would be ineffective in preventing erosion. Therefore, we conclude that the county's determination that the project as proposed would not cause significant environmental effects due to erosion is supported by substantial evidence.

D. Mitigation
We next address CARD's contention that the county inappropriately weighed the mitigation measures proposed to control any effects the gravel pits would have on the environment. When making an EIS determination, one of the criteria an RGU must examine is "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority[.]" Minn. R. 4410.1700, subp. 7(C). The mitigation measures an RGU may consider include current regulations, such as emissions standards. Additionally, an RGU may consider whether mitigation measures may be applied by a regulatory authority.
While mitigation by an ongoing regulatory authority is a required consideration in a project-specific EIS determination review, the court of appeals in several cases has stated that an RGU may not rest its EIS determination decision on "mitigation" that amounts to only "vague statements of good intentions." See, e.g., Nat'l Audubon Soc'y v. Minn. Pollution Control Agency, 569 N.W.2d 211, 217 (Minn.App.1997). We agree with this approach and adopt it as our own. Accordingly, we conclude that it is not sufficient *835 for an RGU to release an EIS determination stating that it did not bother to investigate environmental effects because it was confident it could later pass regulations if any environmental harm occurred. Under MEPA, an RGU must determine whether a given project has the potential for significant environmental effects before approving the project.
When an RGU considers mitigation measures as offsetting the potential for significant environmental effects under Minn. R. 4410.1700, it may reasonably do so only if those measures are specific, targeted, and are certain to be able to mitigate the environmental effects. The RGU must have some concrete idea of what problems may arise and how they may specifically be addressed by ongoing regulatory authority. There is a definite difference between an RGU review that approves a project with vague promises of future mitigation and an RGU review that has properly examined a project and determined that specific measures can be reasonably expected to deal with the identifiable problems the project may cause.
Here, CARD specifically objects to the weight which the county gave to what CARD alleges to be mitigation measures. CARD first notes that the county relied on Duininck's assurance that it would leave 25 and 50 feet of soil over the groundwater in the Eagle Lake West and CA pit areas respectively. CARD points out that the county had no source of information other than Duininck that the water table was as deep as Duininck claimed, and argues that consideration of this limitation on excavation is not appropriate as it is only a "vague statement of good intentions."
We conclude that CARD's focus on the depth of the water table and the remaining soil as mitigation factors is misplaced. While the definition of "mitigation" given in Minn. R. 4410.0200, subp. 51, includes "minimizing impacts by limiting the degree of magnitude of a project," under Minn. R. 4410.1700, subp. 7(C), an RGU may only consider "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority[.]" Duininck's plan to limit excavation to a certain depth therefore may not be considered as proper "mitigation" under Minn. R. 4410.1700, subp. 7(C), as Duininck is not an "ongoing public regulatory authority." Here, the county was considering whether the project, as proposed, had the potential for causing significant environmental effects. As previously noted, should Duininck go outside its specified intentions and mine deeper than it proposed, the EIS determination would no longer apply and additional environmental review would be necessary.
CARD also claims that the county inappropriately gave Duininck credit for mitigation purposes for Duininck's allegedly vague statement that it would engage in "progressive reclamation." A review of the county's supplemental submittal explaining its EIS determination, however, does not indicate that the county relied on the promise of progressive reclamation in finding that there would not be significant environmental effects resulting from these projects. The submittal relies on eventual reclamation, and a reclamation plan was submitted. Whether the reclamation was progressive does not appear to have been a factor in the county's EIS determination. For the foregoing reasons, we conclude that CARD's mitigation arguments lack merit.

E. Cumulative potential effects
Finally, CARD and amici contend that the county did not properly consider cumulative potential effects; they point to the county's decision statement as support for this argument. We agree with CARD *836 that the county's statements regarding cumulative potential effects in its supplemental submittal to its negative EIS determination are problematic. The county appears to have based its cumulative potential effects determination, not on a reasoned consideration of the evidence, but on the erroneous assumption that if a given project does not in itself have the potential for causing significant negative environmental effects, there is no possibility of cumulative potential effects resulting from the project. The county's supplemental submittal read:

To show a cumulative negative impact, there must be reason to believe that each project in itself will at least have a significant negative impact to the environment. Based on the EAW, the responses given in this supplemental submittal to the comments received, along with the responses given by the proposer, RGU staff determines a cumulative negative impact has not been identified.
(Emphasis added.) The county's first sentence is a direct quote from Duininck's response to the letters from citizens and governmental agencies that expressed environmental concerns regarding the proposed pits. The Duininck response referred to reads:

To show a cumulative negative impact, there must be a reason to believe that each project in itself will at least have a significant negative impact to the environment. It has been shown in these EAW's and proven time and time again that gravel pits do not have a negative environmental impact, and many times have a quite positive impact, especially given the current reclamation standards.
(Emphasis added.) This statement was also included in a subsequent Duininck letter to the county. Duininck's argument was reproduced by the county in its statement above to support its conclusion that "a cumulative negative impact has not been identified."
We conclude that an assertion that in order for a group of projects in the aggregate to have a significant environmental impact they must each individually have a significant impact is an arbitrary and capricious basis for an RGU decision. It is contrary to a key underlying premise of a cumulative potential effects review  that an individually insignificant project may have a significant environmental effect when considered in conjunction with other projects. In the present instance, we consider it problematic to suggest that no matter how many gravel pits are established and mined in Kandiyohi County, there is no possibility of significant environmental effects. The county's conclusion that projects must each have individually significant environmental effects before they can have a cumulative effect is so implausible that it could not be explained as a difference in view or the result of the agency's expertise. In re Charges, 597 N.W.2d at 567. Additionally, Duininck's assertion that "gravel pits do not have a negative environmental impact," an assertion upon which the county apparently based its conclusion regarding cumulative potential effects, is dubious at best.
We acknowledge that in this case the proposed gravel pits will not involve any toxic chemicals or other poisoning of the environment. But we consider it problematic to say that removing 92 acres of trees, brush, and other vegetation and digging a hole approximately 35 feet deep across those 92 acres results in absolutely no negative environmental impact (or, more pertinently, no potential for significant environmental effects). We conclude that the county's use of the two foregoing erroneous propositions as a basis for its *837 determination that the proposed gravel pits have no potential for cumulatively causing significant environmental effects is arbitrary and capricious.
The record also indicates that the county's cumulative potential effects determination was not supported by substantial evidence. The county stated that it based its cumulative potential effects determination on three things: "the EAW, and the responses given in this supplemental submittal to the comments received, along with the responses given by the proposer." Regarding cumulative potential effects, Duininck's EAW states only: "The mining of this site will be conforming to the uses of adjacent property, which are gravel mining and agriculture. There will not be any significant environmental effects due to cumulative impacts" regarding the CA pit, and "Because additional mining is being done on the east side of Highway 71, the mining of this site will be in conformity to the use of nearby property. There should not be any significant environmental effects due to cumulative impacts" regarding the Eagle Lake West pit. The second item the county considered was the county's own responses to the environmental concerns raised by government agencies and citizens, which it stated were expressed elsewhere in its EIS-determination supplement. This second reference is at best confusing, as there is no other cumulative potential effects analysis in the supplemental submittal.[17] The final item was Duininck's response to the citizen concerns. As shown above, Duininck's response consisted of a blanket assertion that there is no possibility of cumulative potential effects from the proposed gravel pits because gravel pits never have a negative environmental impact and a significant negative environmental impact must be shown before there can be cumulative negative effects.[18]
None of these documents cited by the county as providing support for its cumulative potential effects analysis contain anything other than bare assertions that no cumulative potential effects will occur. The documents do not contain any independent scientific data, agency opinions, or studies regarding cumulative potential effects, and there is no indication that the county ever sought any information on cumulative potential effects aside from Duininck's assurances that there would not be any. Therefore, we conclude that the record contains no actual evidence or even substantive explanation to support the county's cumulative potential effects determination.
At this point, it is important to note that the court of appeals erroneously concluded that the county sufficiently considered cumulative potential effects based on the *838 minutes of the county board meetings from the earlier denied and otherwise unsuccessful conditional use permit applications for the two proposed gravel pits and the one board meeting conducted after the EIS determination. Citizens Advocating Responsible Dev., 2005 WL 44823 at *3. In those minutes, members of the community and some board members expressed concern about the number of existing gravel pits in the area and how to reclaim them. However, none of the meetings in the record before us concerned the EIS determination; they were meetings regarding earlier and subsequent conditional use permit applications (all of which were denied or withdrawn). In fact, the main county board meeting at which environmental concerns were discussed by the board took place after the county's negative EIS determination, and even then, the concerns discussed were more of an aesthetic nature than an analysis of environmental effects. Even if the foregoing meetings were relevant to the county's decision, the county did not explicitly consider or discuss the potential environmental effects in depth in any of these meetings.
We conclude that there is simply not enough evidence in the record before us to show that the county actually took a "hard look" at the question of cumulative potential effects during the EIS determination as required by Minn. R. 4410.1700, subp. 1, and our case law. Reserve Mining Co., 256 N.W.2d at 825. The county's determination does not appear to be based on any real examination of the question, but rather on its problematic statement that "[t]o show a cumulative negative impact, there must be a reason to believe that each project in itself will at least have a significant negative impact to the environment." Therefore, we conclude that the county's decision regarding cumulative potential effects was not supported by substantial evidence.
Additionally, while the county was apparently looking for "negative" effects, Minn. R. 4410.1700 specifically requires that an EIS be ordered if the RGU finds the potential for any significant environmental effects, "negative" or otherwise. In fact, the rules as initially proposed contained a requirement that the environmental effects be "adverse," but this requirement was purposely deleted from the rules as adopted. See 7 S.R. 354. The county's supplemental submittal indicates that the county erroneously failed to consider any potential for significant environmental effects which it did not deem "negative." We conclude that the county's consideration of only whether cumulative potential effects would result in a negative environmental impact was a mistake of law.
Because we conclude that the county did not appropriately consider one of the required criteria  the cumulative potential effects of related or anticipated future projects  we reverse the court of appeals. However, as the county did not collect substantial evidence on cumulative potential effects, we do not have sufficient information at our disposal to determine whether an EIS is required in this case. Accordingly, we remand this matter to the county to conduct a new EIS determination process in accordance with the standards set forth in this opinion. In doing so, we explicitly express no opinion as to whether an EIS is required.
Reversed and remanded to the county for a new administrative determination.
GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.
Concurring, ANDERSON, G. BARRY, J.
Took no part, GILDEA, J.
*839 ANDERSON, G. BARRY, Justice (concurring).

CONCURRENCE
I join in the majority opinion but write separately because, while I agree there is not enough evidence in the record to demonstrate that the county actually took a "hard look" at the question of cumulative potential effects, left unstated in the majority opinion are the significant burdens associated with the relief requested by appellants.
As both the majority opinion and the district court order correctly note, an environmental impact statement (EIS) is an exhaustive environmental review.
But describing an EIS as exhaustive only tells half of the story. A completed EIS analyzes the significant environmental impacts of the proposed action, "discusses appropriate alternatives to the proposed action and their impacts, * * * explores methods by which adverse environmental impacts of an action could be mitigated, * * * [and analyzes] economic, employment and sociological effects that cannot be avoided should that action be implemented." Minn.Stat. § 116D.04, subd. 2a (2004). In addition to this breadth of analysis, an EIS is procedurally demanding as well. Completion of an EIS involves preparation of both a draft and final EIS. See Minn. R. 4410.2600, 4410.2700. An informational meeting must be held and public comments accepted on the draft EIS. Minn. R. 4410.2600, subps. 8-9. Public comments may also be submitted regarding the adequacy of the final EIS. See Minn. R. 4410.2700, subp. 6; Minn. R. 4410.2800, subp. 2 (2005).
To the surprise of no one, preparation and distribution of an EIS is neither swift nor inexpensive. The cost of preparation and distribution of an EIS is borne by the proposer of a specific action. Minn.Stat. § 116D.045 (2004). Last year, the Minnesota Pollution Control Agency estimated that an EIS usually takes at least one year to complete and costs at least $100,000. Pub. Info. Office, Minn. Pollution Control Agency, General Public # 5-03, Minnesota's Environmental Review Program (2005).
Despite multiple briefs and hundreds of pages of record submitted by the parties, I am struck by the relative paucity of any actual facts demonstrating that an environmental impact statement should be required. At most, appellants have raised questions about the environmental effects of gravel mining generally, and given that the legislature has not chosen to require an EIS for each and every proposed gravel pit, it seems doubtful that the requirements for an EIS have been met here. Speculative objections about future environmental effects have been rejected in the past as grounds for overturning a negative Environmental Assessment Worksheet (EAW) declaration. See White v. Minn. Dep't of Natural Res., 567 N.W.2d 724, 731-32 (Minn.App.1997); Iron Rangers for Responsible Ridge Action v. Iron Range Res., 531 N.W.2d 874, 881 (Minn. App.1995). Put another way, an EIS is an extraordinary burden on the rights of a property owner and is not routinely imposed.
But I join with the majority today because I am persuaded that appellants are entitled to a review by the county of the cumulative potential effects of another gravel pit in the area before a negative EAW is issued because neither the county nor Duininck addressed the issue and our law requires they do so.
NOTES
[1] The gravel deposits in Kandiyohi County were left by a glacier 10,000 years ago. Roger Strand, Kandiyohi County History, Introduction to the Kandiyohi County Comprehensive Plan 1 (2004) (available at http://www.co.kandiyohi.mn.us/depts/EnvSvcs/ LandUse/04-Kandiyohi% 20Chapter% 20One. pdf.)
[2] Duininck explained that it wished to mine the gravel from the smaller area before the Minnesota Department of Transportation condemned the property for road construction purposes.
[3] MEPA's basic framework was codified in Minn.Stat. § 116D.04; however, the legislature directed the EQB to pass more specific rules to govern the environmental review procedures. The EQB did so; the environmental review regulations that it formulated are found in chapter 4410 of the Minnesota Rules.
[4] Generally, the Minnesota Rules specify which governmental body will serve as the RGU. See Minn. R. 4410.0500.
[5] The definition given for "cumulative impact" in Minn. R. 4410.0200, subp. 11, reads as follows:

Cumulative impact. "Cumulative impact" means the impact on the environment that results from incremental effects of the project in addition to other past, present, and reasonably foreseeable future projects regardless of what person undertakes the other projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.
[6] The EQB is the default RGU for generic EIS determinations. Minn. R. 4410.3800, subp. 2. In project-specific EIS determinations, the RGU is usually a local governmental body. See Minn. R. 4410.0500.
[7] 40 C.F.R. 1508.8 reads in relevant part:

Sec. 1508.8 Effects.
* * * Effects and impacts as used in these regulations are synonymous.
[8] The deleted definition was as follows:

"Related action" means two or more projects that will affect the same geographic area which a RGU determines:
a.) Are planned to occur or will occur at the same time; or
b.) Are of a nature that one of the projects will induce the other project.
7 S.R. 349
[9] Administrative regulations as well as statutes are governed by general rules of construction. White Bear Lake Care Center, Inc. v. Minnesota Dept. of Public Welfare, 319 N.W.2d 7, 8 (Minn.1982).
[10] For instance, Minn.Stat. § 116D.01 states that the purpose of the environmental laws at issue here is "(a) to declare a state policy that will encourage productive and enjoyable harmony between human beings and their environment; (b) to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of human beings; and (c) to enrich the understanding of the ecological systems and natural resources important to the state and to the nation." Minn.Stat. § 116D.01 (2005).
[11] Minnesota Rules 4410.0300, subp. 3, states:

The Minnesota Environmental Policy Act recognizes that the restoration and maintenance of environmental quality is critically important to our welfare. The act also recognizes that human activity has a profound and often adverse impact on the environment.
A first step in achieving a more harmonious relationship between human activity and the environment is understanding the impact which a proposed project will have on the environment.
The purpose of parts 4410.0200 to 4410.6500 is to aid in providing that understanding through the preparation and public review of environmental documents.
[12] As originally proposed, the word "action(s)" was used throughout the environmental review rules; at the time of passage of the rules, however, "action(s)" was changed throughout the rules to "project." See, e.g., 7 S.R. 352-55. Accordingly, "cumulative potential effects of related or anticipated future actions" was changed to "cumulative potential effects of related or anticipated future projects" before Minn. R. 4410.1700 was passed. 7 S.R. 354, Minn. R. 4410.1700, subp. 7 (emphasis added). While the term "related action(s)" retained the word "action(s)" in the titles of both its definition and application sections, its definition was changed to refer to "two or more projects that will affect the same geographic area which an RGU determines: a.) Are planned to occur or will occur at the same time; or b.) Are of a nature that one of the projects will induce the other project." 7 S.R. 349. Additionally, the "related action(s)" application section in Minn. R. 4410.1700 stated "When two or more projects are related action(s), their cumulative potential effect on the environment shall be considered in determining whether an EIS is required." Minn. R. 4410.1700 (1983). Both these "related action(s)" sections were later deleted; however, this procedural history indicates that "related action(s)" was still intended to apply to the "cumulative potential effects" criterion despite using the term "action(s)" instead of "projects," as was noted in the initial 1982 "Statement of Need and Reasonableness."
[13] The "related action(s)" section did not apply to a "cumulative impact" analysis, which further supports our conclusion in section I that "cumulative potential effects" and "cumulative impact" were intended to be two separate inquiries. Minn. R. 4410.3800 (1983).
[14] Statements in the 1982 SONAR imply that the "cumulative impact" inquiry used for determining whether a generic EIS is required is an analysis of the "total and long range impacts," which is at least potentially broader in "scope" than the inquiry used in a project-specific EIS determination. 1982 SONAR 6, MCAR § 3.036 A.
[15] In Minnesota Center for Environmental Advocacy, we held that the standards of review laid out in the Minnesota Administrative Procedure Act applied to environmental review cases. Minn. Ctr. for Envtl. Advocacy, 644 N.W.2d at 464.
[16] These numbers may not be entirely reliable, as the hydrological budget from which they were taken warns that its calculations are only approximations.
[17] It could be that the county meant that, because it found no potential for significant environmental impacts to the air, groundwater, or due to erosion, it could not find any possibility of cumulative potential effects. But on the face of the rules, that would be a deficient analysis, as it would require that before there could be any cumulative potential effects, there must first be a potential for significant environmental effects under another of the project-specific environmental review criteria.
[18] None of Duininck's statements regarding cumulative potential effects, upon which the county relied, provided any substantive support for the county's decision. In addition to the logically erroneous Duininck statement cited above, the EAWs, which were prepared by Duininck, both stated only that gravel mining was in conformity with local land uses in the proposed pit areas and there will/should "not be any significant environmental effects due to cumulative impacts." A conclusory statement on the part of a developer that a proposed project will not result in environmental effects is an inappropriate basis for an EIS determination.