*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2141**

In re Application of Gourley Brothers, LLC
for a Water Appropriation Permit.

**Filed August 24, 2015
Affirmed
Toussaint, Judge**[*]

Department of Natural Resources
File No. 2013-1423

Amanda P. Hungerford (pro hac vice), Washington, D.C. (for relators Russell Anderson, Katrina Downes, Travis Winter, Joel Walsh, Amy Walsh, and Mary Soupir)

Amanda E. Prutzman, Eckberg, Lammers, Briggs, Wolff & Vierling, PLLP, Stillwater, Minnesota (for relators The Humane Society of the United States, Russell Anderson, Katrina Downes, Travis Winter, Joel Walsh, Amy Walsh, and Mary Soupir)

Lori Swanson, Attorney General, Karen D. Olson, Assistant Attorney General, St. Paul, Minnesota (for respondent Minnesota Department of Natural Resources)

Jack Y. Perry, Maren F. Grier, Briggs and Morgan, P.A., Minneapolis, Minnesota (for respondents Gourley Premium Pork, a/k/a Gourley Premium Pork, LLC, a/k/a Gourley Brothers, LLC)

Considered and decided by Johnson, Presiding Judge; Kirk, Judge; and Toussaint, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**TOUSSAINT**, Judge

Relators[1] challenge respondent Minnesota Department of Natural Resources' (DNR) issuance of a water-appropriation permit, arguing that the DNR's decision was arbitrary and capricious and its findings were not supported by substantial evidence. We affirm.

## FACTS

In 2012, Gourley Brothers, LLC (Gourley) proposed to build a total-confinement, 4,000-hog feedlot in Todd County. The proposed feedlot underwent environmental review in 2012. The Minnesota Pollution Control Agency (MPCA) completed an environment assessment worksheet (EAW) and determined that the feedlot did not have the potential for significant environmental effects, negating the need for an environmental impact statement (EIS).

In May 2013, Gourley applied for a water-appropriation permit from the DNR. Included with the application was a "well and boring record" that identified the location of each well and provided geological information and information on the static water level of the aquifer. Gourley also submitted well pump test results for each well that indicated the drawdown and recovery rates of the aquifer when both wells were pumping water at the maximum rate. The DNR requested additional information from Gourley, including property tax information, and an estimate of daily and annual water usage,

---

[1] Relators include the Humane Society of the United States (the humane society), Russell Anderson, Katrina Downes, Travis Winter, Joel Walsh, Amy Walsh, and Mary Soupir.

which Gourley provided. According to Gourley's water usage estimates, the feedlot would use approximately 6.62 million gallons of water per year.

In early October, the DNR issued Gourley a water-appropriation permit allowing the feedlot to use up to 8 million gallons of water annually. In November, relators requested a contested case hearing on the issuance of the permit under Minn. Stat. 103G.311 (2014). DNR denied this request on the basis that relators are not one of the parties permitted to demand a hearing under Minn. Stat. 103G.311, subd 5(a). Relators petitioned for certiorari review of the DNR's issuance of the permit, arguing the DNR inappropriately issued the permit without making factual findings. This court agreed, concluding that the DNR's failure to provide any findings prevented meaningful appellate review of its decision. *In re Gourley Bros., LLC*, No. A13-2247, 2014 WL 4056063, at *5 (Minn. App. Aug. 18, 2014) (hereinafter "*Gourley I*"). Accordingly, this court remanded for additional findings. *Id.* In September 2014, DNR issued an amended water-appropriation permit that adopted and incorporated the MPCA's findings from the EAW and negative declaration on the need for an EIS. This certiorari appeal follows.

## D E C I S I O N

"[D]ecisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field[s] of their technical training, education, and experience." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn. 1977). This court's role is to ensure the agency has taken a "hard look" at the salient issues and "genuinely engaged in reasoned decision-making." *Id.* at 825. We will not disturb an agency's decision unless

3

it reflects an error of law, the findings are arbitrary and capricious, or the findings are not supported by substantial evidence. *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs,* 713 N.W.2d 817, 832 (Minn. 2006) (quotation omitted).

"Substantial evidence consists of: (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than 'some evidence'; (4) more than 'any evidence'; and (5) evidence considered in its entirety." *Id.* (quotation omitted). An agency's decision is arbitrary and capricious if the agency (a) relied on factors the legislature never intended it to consider, (b) entirely failed to consider an important aspect of the problem, (c) offered an explanation for the decision that runs counter to the evidence, or (d) rendered a decision so implausible that it could not be ascribed to a difference in view or the result of agency expertise. *Watab Twp. Citizen All. v. Benton Cnty. Bd. of Comm'rs,* 728 N.W.2d 82, 89 (Minn. App. 2007), *review denied* (Minn. May 15, 2007).

If an agency engages in reasoned decision-making, this court will affirm, even though it may have reached a different conclusion had it been the factfinder. *Cable Commc'ns Bd. v. Nor-west Cable Commc'ns P'ship*, 356 N.W.2d 658, 669 (Minn. 1984). The party challenging the agency decision has the burden of proving grounds for reversal. *Markwardt v. State Water Res. Bd.,* 254 N.W.2d 371, 374 (Minn. 1977).

Relators argue that the DNR's decision to grant a water-appropriation permit was arbitrary and capricious because its findings on remand represent conclusory post-hoc rationalizations and "unsubstantiated assertions," which demonstrate that the DNR failed

4

to conduct a meaningful review of the statutory factors it was required to consider. We

disagree.

A complete groundwater-use permit application requires the following:

> (1) a water well record . . . information on the subsurface geologic formations penetrated by the well and the formation or aquifer that will serve as the water source, and geologic information from test holes drilled to locate the site of the production well;
> (2) the maximum daily, seasonal, and annual pumpage rates and volumes being requested;
> (3) information on groundwater quality in terms of the measures of quality commonly specified for the proposed water use and details on water treatment necessary for the proposed use;
> (4) an inventory of existing wells within 1−1/2 miles of the proposed production well or within the area of influence, as determined by the commissioner. The inventory must include information on well locations, depths, geologic formations, depth of the pump or intake, pumping and nonpumping water levels, and details of well construction; [and]
> (5) the results of an aquifer test completed according to specifications approved by the commissioner. The test must be conducted at the maximum pumping rate requested in the application and for a length of time adequate to assess or predict impacts to other wells and surface water and groundwater resources. The permit applicant is responsible for all costs related to the aquifer test, including the construction of groundwater and surface water monitoring installations, and water level readings before, during, and after the aquifer test[.]

Minn. Stat. § 103G.287, subd. 1(a) (2014). The DNR is permitted to waive any of the

application requirements above "if the information provided with the application is

adequate to determine whether the proposed appropriation and use of water is sustainable

and will protect ecosystems, water quality, and the ability of future generations to meet their own needs." *Id.*, subd. 1(b) (2014).

The DNR shall issue the water-appropriation permit if it concludes the applicant's plans are "reasonable, practical, and will adequately protect public safety and promote the public welfare." Minn. Stat. § 103G.315, subd. 3 (2014). The DNR shall make findings of fact on issues necessary for determination of the applications considered and those findings must be based on substantial evidence. *Id.*, subd. 2 (2014). The DNR shall consider the following factors when reviewing an application:

> (1) the location and nature of the area involved and the type of appropriation and its impact on the availability, distribution, and condition of water and related land resources in the area involved;
> (2) the hydrology and hydraulics of the water resources involved and the capability of the resources to sustain the proposed appropriation based on existing and probable future use;
> (3) the probable effects on the environment including anticipated changes in the resources, unavoidable detrimental effects, and alternatives to the proposed appropriation;
> (4) the relationship, consistency, and compliance with existing federal, state, and local laws, rules, legal requirements, and water management plans;
> (5) the public health, safety, and welfare served or impacted by the proposed appropriation;
> (6) the quantity, quality, and timing of any waters returned after use and the impact on the receiving waters involved;
> (7) the efficiency of use and intended application of water conservation practices;
> (8) the comments of local and regional units of government, federal and state agencies, private persons, and other affected or interested parties;
> (9) the adequacy of state water resources availability when diversions of any waters of the state to any place outside of the state are proposed;

> (10) the economic benefits of the proposed appropriation based on supporting data when supplied by the applicant.

Minn. R. 6115.0670, subp. 2 (2013).

The DNR expressly adopted the MPCA's findings from its EAW and negative declaration, and relied heavily on them in justifying its decision to issue the permit. Such reliance on the MPCA's findings is authorized by law. *See* Minn. R. 4410.7055 (2013) (directing governmental bodies with permitting authority over a project to consider environmental review in making a decision to authorize the project); Minn. R. 4410.0300, subp. 4 (2013) (identifying objectives of the environmental review process including the provision of usable information to "governmental decision makers . . . concerning the primary environmental effects of a proposed project"). And when the DNR's findings are considered in conjunction with the adopted MPCA findings it is clear that the DNR's decision was not arbitrary and capricious and based on substantial evidence in the record.

First, the adopted MPCA findings as a whole support the determination that the feedlot's water appropriation will not dangerously deplete the aquifer and is unlikely to contaminate the area's water resources. With regards to the impact on available groundwater, the EAW states:

> A review of published geologic and hydrogeologic data indicates that the water-bearing characteristics of the surficial aquifer (including recharge) and the nature of its existing use as a groundwater source, water use for this project is not expected to interfere with other groundwater uses.

The negative declaration also acknowledged that "[s]ignificant adverse impacts to water quantity are not expected." Moreover, we disagree with relators' assertion that the MPCA deferred to the DNR on the issue of groundwater quantity based on its acknowledgement that Gourley was required to secure a water-appropriation permit from the DNR. The substance of MPCA's findings does not indicate that it deferred to the DNR to determine the groundwater impact of the project. Rather, it demonstrates that the MPCA was merely highlighting the fact that the water-appropriation permit provided a further mechanism to investigate and address any "well interference" that might arise in the future.

Second, the EAW and negative declaration found that the feedlot would not negatively impact surface or groundwater quality. The MPCA specifically noted that the facility was a "total confinement" building with no access to surface water and "[t]he manure storage structures proposed will be concrete, will not be open to the environment, and are designed specifically to prevent contamination of groundwater." The MPCA also highlighted the fact that the feedlot was required to meet a "zero discharge" standard as part of its 2011-2016 Feedlot General NPDES/SDS permit, which minimized, if not eliminated, the risk of water contamination.

Third, in addition to adopting and discussing the MPCA findings above, the DNR identified other evidence in the record that supports its decision to issue the permit. With regard to the feedlot's impact on water quantity and availability, the DNR noted that the pump test data indicates that the aquifer "is strong, stabilized at three feet of drawdown, and quickly recharged." The DNR further explained that this pump test data was

8

analyzed by a DNR Area Hydrologist who determined the proposed appropriation was sustainable. The DNR also stated that in completing this hydrological analysis it relied on the County Well Index and its well and boring records that included information about the wells' location, depth, static water level, construction and geological analysis.

Relators challenge the reliability of the DNR hydrologist's calculations and the data she relied on in making those calculations. The DNR's findings indicate its hydrologist reviewed the data in the record, did not find it lacking and used it to determine the appropriation's impact on the aquifer would not be detrimental. Such findings and determinations fall squarely within the realm of the agency's technical training and expertise. We defer to the agency on such matters when, as is the case here, there is support in the record for its conclusions. *Reserve Mining*, 256 N.W.2d at 824.

The DNR's findings also addressed the environmental and public health concerns raised by "Brooke Haworth, the Humane Society of the United States, the Socially Responsible Agricultural Project, and Minnesotans Fighting for Minnesota." The DNR explained that "[t]he MPCA Findings specifically addressed the water quality and public health concerns raised in [the] comments" and the DNR relied on those findings, which "determined that the proposed project does not pose a significant environmental effect on groundwater or surface water quality." The DNR also addressed the commenters concerns about the impact on the aquifer, stating "[c]oncerns raised regarding the effect of the water appropriation on the water table" were not only addressed by the MPCA's determination that the groundwater appropriation did not have the potential for

environmental effects, but also by the DNR's hydrological analysis which showed that the proposed appropriation "was not likely to have a deleterious effect on the aquifer."

In sum, the DNR's discussion of the evidence above demonstrates that its findings were more than conclusory post hoc rationalizations, as relators suggest. On remand, the DNR was directed to make findings and it did so in part by permissibly relying on the MPCA environmental review findings. Moreover, the DNR's findings relied on its own hydrologist's analysis of the evidence in the record. Such analysis is entitled to deference in this context as it addresses matters that fall directly within the DNR's area of technical expertise. This analysis combined with the MPCA findings that the DNR properly relied upon demonstrate its decision to grant the water-appropriation permit was based on substantial evidence in the record. And when the DNR's findings are examined as whole, along with the adopted MPCA findings, we are not left with the distinct impression its actions in this context were arbitrary and capricious. Accordingly, we affirm the DNR"s decision to grant the water-appropriation permit.

**Affirmed.**