**WATAB TOWNSHIP CITIZEN
ALLIANCE, et al.,
Relators,**

v.

**BENTON COUNTY BOARD
OF COMMISSIONERS,
et al., Respondents,**

**Scott P. Jarnot Development,
LLC, Respondent,**

**Scott P. Jarnot, Respondent (A06–378);**

**Watab Township Citizen Alliance,
et al., Appellants,**

v.

**Benton County Board of Commissioners, Respondent (A06–1069).**

**Nos. A06–378, A06–1069.**

Court of Appeals of Minnesota.

Feb. 27, 2007.

84

James P. Peters, Karna M. Peters, Peters & Peters, PLC, Alexandria, MN, for relators/appellants.

Robert J. Raupp, Benton County Attorney, Foley, MN and Joseph J. Langel, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for respondents County of Benton and Benton County Board of Commissioners.

Scott P. Jarnot, Scott P. Jarnot DVLP, LLC, Brooklyn Park, MN, pro se respondent A06–378.

Considered and decided by PETERSON, Presiding Judge; WILLIS, Judge; and DIETZEN, Judge.

## OPINION

DIETZEN, Judge.

In these consolidated appeals, relators Watab Township Citizens Alliance, et al., challenge the denial of their petition for an environmental assessment worksheet (EAW) by respondent Benton County, arguing that the proposed project may have the potential for significant environmental effects. They also argue that the county's decisions to rezone and approve the preliminary and final plat applications for the subject property were arbitrary, capricious, and contrary to law. Because we conclude that the county's decisions not to require an EAW and to approve the preliminary and final plat applications with conditions did not involve an error of law and were supported by substantial evidence, we affirm. And because the county's rezoning decision is a legislative act not properly before this court on certiorari, we dismiss that portion of the appeal.

## FACTS

Watab Township Citizens Alliance (WTCA) is a nonprofit organization whose members reside in Watab Township, near the proposed Lake Andrew development project (project). Developer Scott Jarnot (Jarnot) owns 75.3 acres of land on which he proposes to develop 61 residential lots. In late 2004, Jarnot applied to Benton County (county) to rezone the subject property from A–2 (agricultural) to R–3 (residential) and for preliminary plat approval. Jarnot also proposed a community water well and a community waste-water treatment facility for the project. Following a hearing, the county's planning commission recommended denial of the rezoning and preliminary plat applications for the project. Subsequently, the county board considered the matter and approved the applications for rezoning and preliminary plat with conditions, which included conducting a well draw-down test to determine if the project would adversely affect existing neighboring wells.

In February 2005, a petition for an EAW signed by the requisite number of individuals was submitted to the Minnesota Environmental Quality Board (MEQB). The petition, together with the cover letter, raised concerns that the proposed project would be served by a township road that was substandard and unsafe, that rezoning to R–3 would result in illegal "spot zoning," that waste-water contamination discharged from the project would adversely affect adjoining wetlands, and that the project had the potential to deplete the water table. In March 2005, the MEQB assigned the petition-review process to the county as the responsible governmental unit (RGU).

The county requested that Jarnot and the Department of Natural Resources (DNR) provide data addressing the water-supply issue. Jarnot responded by conducting water draw-down tests and compiling data obtained from the DNR. Dan Lais, a DNR hydrologist, submitted his

"quick assessment" of Jarnot's pump-test data to the county, which concluded that the project may cause one neighboring well to draw down below the pump setting and that other neighboring wells may need to be connected to Jarnot's water supply, or have their pumps lowered to maintain water supply. Additional data was submitted by Jarnot's engineer, who reviewed the water test pumping data and estimated the volume of waste generated and potable water attributable to the proposed project.

In April 2005, the county board denied WTCA's petition for an EAW, reasoning that the project did not have the potential for significant environmental effects and that any potential environmental effects would be mitigated by the state authorities that have regulatory and permitting authority over the project's waste-water and water-supply systems.

In May 2005, WTCA commenced a declaratory-judgment action challenging the county's decision not to require an EAW. Jarnot then applied to the Minnesota Pollution Control Agency (MPCA) for a National Pollutant Discharge Elimination System (NPDES) permit, which was required for the community waste-water system for the project. In August 2005, the MPCA wrote Jarnot stating that because of a recent decision of this court[1] involving the protection of impaired waters, the MPCA was reevaluating its NPDES permit program. As a result, Jarnot redesigned the waste-water treatment facility for the project to avoid discharge into adjacent wetlands. In November 2005, the MPCA issued an NPDES permit for the project with a permitted capacity of 110 residential units.

Jarnot also applied to the DNR for a water-appropriation permit for the community water well proposed by the project. Following discussions with the DNR, Jarnot agreed that, as a condition of the permit, he would be responsible to correct any water supply problems for neighboring wells caused by the project. Subsequently, the DNR issued the water-appropriations permit subject to the agreed-on condition.

Jarnot submitted revised applications for preliminary and final plat approval to reflect changes required by the MPCA for the community sewage-treatment system. The revised plans were the subject of a public hearing before the planning commission and the county board. At both hearings, there was extensive discussion regarding the NPDES permit and its permit capacity of 110 units, the DNR water-appropriations permit, and other citizen concerns regarding the potential environmental impact of the project. The county board continued the matter to its January 2006 meeting to reconsider its EAW decision and the zoning applications in light of the changes in the proposed project. As a result, the parties in this proceeding agreed to continue a previously scheduled summary-judgment hearing for WTCA's declaratory-judgment action until after the county board hearing.

At the January 17, 2006 county board hearing, the DNR hydrologist confirmed that the DNR had issued a water-appropriation permit for the project and that appropriate measures had been taken— including conditions to the DNR permit— to resolve any potential adverse interference with neighboring wells. The permit

---

1. *In re Cities of Annandale and Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater*, 702 N.W.2d 768 (Minn. App.2005) (holding, inter alia, that in the absence of a total maximum daily load, a permit may issue to a new source that does not otherwise cause or contribute to an impairment of waters with impaired status), *review granted* (Minn. Oct. 26, 2005).

capacity of the community waste-water treatment facility was discussed at length, and Jarnot confirmed that the actual construction of the facility would be limited to the 61 units proposed by the project. Following the hearing, the county board confirmed its decision that the EAW was not required and approved Jarnot's applications for rezoning and amended preliminary and final plat.

The district court then granted the county's motion for summary judgment, concluding that the project as proposed did not have the potential for significant environmental effects, and, therefore, an EAW was not required. This appeal follows. Separately, WTCA seeks certiorari review of the county's decisions to rezone and grant preliminary and final plat approval of the proposed project. By previous order, these matters were consolidated for review.

## ISSUES

I. Did the county err by concluding that the project did not require an EAW?

II. Is this court procedurally barred from considering WTCA's certiorari appeal of the county's rezoning decision?

III. Did the county err by granting the developer's application for amended preliminary and final plat approval?

## ANALYSIS

### I.

 WTCA contends that the district court erred by concluding that the proposed project did not require an EAW. On appeal from summary judgment, appellate courts review the governmental body's EAW determination on the basis of wheth-er it was unreasonable, arbitrary, or capricious, without according deference to the district court's review. *Citizens Advocating Responsible Development v. Kandiyohi County,* 713 N.W.2d 817, 832 (Minn. 2006). An agency's decision is arbitrary or capricious if the agency (a) relied on factors the legislature never intended it to consider, (b) entirely failed to consider an important aspect of the problem, (c) offered an explanation for the decision that runs counter to the evidence, or (d) rendered a decision so implausible that it could not be ascribed to a difference in view or the result of agency expertise. *Pope County Mothers v. Minnesota Pollution Control Agency,* 594 N.W.2d 233, 236 (Minn.App.1999). We will reverse an agency decision if its findings are unsupported by substantial evidence. Kandiyohi County, 713 N.W.2d at 832. In our review, we probe whether the agency has taken a "hard look" at the salient problems and has "genuinely engaged in reasoned decision-making." *Id.* (quotation omitted).

The MEQB has promulgated rules regarding the environmental-review process. Under these rules, the MEQB reviewed the petition for an EAW, determined that the petition complied with the rules, and forwarded it to Benton County as the "responsible governmental unit" (RGU) to determine whether the proposed project required the preparation of an EAW. Minn R. 4410.1100 (2005).

 Minn.Stat. § 116D.04 (2006) sets forth the criteria for determining when an environmental-impact statement (EIS) and an EAW must be prepared for a project. It provides that an EIS must be prepared when a project has the potential for significant environmental effects resulting from any government action.[2] *Id.* In contrast,

---

**2.** "Governmental action" means activities, including projects wholly or partially conducted, permitted, assisted, financed, regulated, or approved by units of government including the federal government. Minn.Stat. § 116D.04, subd. 1a(d).

an EAW is required whenever material evidence is presented by petitioners showing that the project may have the potential for significant environmental effects. *Compare* Minn.Stat. § 116D.04, subd. 2a(a) and subd. 2a(c). Thus, the criteria for preparation of an EAW ("may have the potential for significant environmental effects") is lower than the criteria for preparation of an EIS.

WTCA first argues that an EAW was required because it presented a petition that contained 35 signatures, a letter briefly stating WTCA's major concerns, a testimonial letter signed by two neighboring property owners, two maps depicting the project site and various geological features of the area, and other evidence showing the project may have the potential for significant environmental effects. The county argues that WTCA merely presented the unsubstantiated fears and concerns of its members rather than material evidence.

■ The threshold requirement under the EAW statute is whether there is material evidence that the project may have the potential for significant environmental effects. Minn.Stat. § 116D.04, subd. 2a(c); *Carl Bolander & Sons Co. v. City of Minneapolis,* 502 N.W.2d 203, 207 (Minn.1993). Material evidence is not defined in the statute or the rules promulgated by the MEQB. Minn.Stat. § 116D.04, subd. 5a. We interpret a statute by giving its words their plain and ordinary meaning. *Minch v. Buffalo–Red River Watershed Dist.* 723 N.W.2d 483, 487 (Minn.App.2006), *review denied* (Minn. Jan. 24, 2007); *see also* Minn.Stat. § 645.08(1) (2006) (mandating that words and phrases be construed according to their common and approved usage).

■ We conclude that "material" evidence means such evidence as is admissible, relevant, and consequential to determine whether the project may have the potential for significant environmental effects. *See The American Heritage Dictionary of the English Language* 1080 (4th ed.2000) (defining "material"). In this case, the need for an EAW is determined by an administrative agency, i.e., the MEQB and the county, in an administrative proceeding. Thus, we conclude that under Minn.Stat. § 116D.04, subd. 2a(c), "material evidence" is evidence that is both admissible in an administrative proceeding before a state agency and relevant and consequential to whether the project may have the potential for significant environmental effects. Allegations of vague or generalized fears and concerns are therefore not sufficient under the statute. But evidence that is admissible, relevant, and consequential to determine whether the project may have the potential for significant environmental effects does qualify as material evidence. *See* Minn. R. 4410.1100, subp. 6 ("The RGU shall deny the petition if the evidence presented fails to demonstrate that the project may have the potential for significant environmental effects.").

■ The MEQB has identified four criteria that the RGU must use to evaluate a project's "potential for significant environmental effects." Those factors are:

A. type, extent, and reversibility of environmental effects;

B. cumulative potential effects of related or anticipated future projects;

C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority; and

D. the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken

by public agencies or the project proposer, including other EISs.

Minn. R. 4410.1700, subps. 6, 7 (2005). Because the criteria apply explicitly to the need for an EIS and not an EAW, appellant argues that the county erred in considering the criteria. We disagree.

In determining the need for an EAW, the RGU must review all of the material evidence to determine whether the proposed project may have the potential for significant environmental effects. Minn. Stat. § 116D.04, subd. 2a(c). The MEQB criteria are relevant factors in considering whether the proposed project may harm the environment because the rules regarding both EAWs and EISs use the language of "significant environmental effects." *Compare* Minn. R. 4410.1100, subp. 6 *and* Minn. R. 4410.1700, subp. 6. The county used these factors to examine the environmental factors at its April 15, 2005 board meeting and was presented with data from the MPCA, the DNR, and the Minnesota Department of Health, on water appropriation, well-testing, and waste-water treatment. WTCA argues that four potential environmental impacts require the preparation of an EAW.

### A. *Township Road*

 WTCA argues that the current township road lacks capacity to handle the additional traffic generated by the development of 61 homes, that the road is unsafe, and that the additional traffic will create additional noise and dust in the surrounding area.

The county found that "[t]he sufficiency of the existing road [was] not an environmental issue" and that it could be addressed or mitigated through the placement of conditions on the rezoning or plat approval. *See* Minn. R. 4410.1700, subp. 7 (allowing RGUs to consider the extent to which potential environmental effects are

subject to mitigation by ongoing public regulatory authority). The district court declined to address the issue.

We conclude that the impact of additional vehicles generated by the project may be an environmental effect. But WTCA did not present material evidence on this issue. Absent the presentation of such material evidence, no basis exists to conclude that the additional traffic may have the potential to significantly effect the environment. Minn.Stat. § 116D.04, subd. 2a(c).

### B. *Spot Zoning*

 WTCA next argues that the rezoning of the subject property from A–2 to R–3 constitutes illegal spot zoning, which may result in the potential for significant environmental effects. "Spot zoning" applies to "zoning changes, typically limited to small plots of land, which establish a use classification inconsistent with surrounding uses and create an island of nonconforming use within a larger zoned district." *Rochester Ass'n of Neighborhoods v. City of Rochester,* 268 N.W.2d 885, 891 (Minn.1978).

The county board found that the issue of "spot zoning" could be "addressed through the rezoning process during the course of future public hearings" and that "[s]pot zoning concerns do not relate to the 'environment'" as that term is defined in Minn. R. 4410.0200, subp. 23 (2005), but instead involve the "appropriateness of the proposed rezoning in the context of the County's Comprehensive Plan." The district court declined to address the issue.

Essentially, WTCA argues that the project will create an R–3 residential zone within an A–2 agricultural zone located four miles from the nearest city limits, which will cause conflicting land uses that may result in the potential for significant

environmental effects. Incompatible land uses may have a social impact on the surrounding area but such an impact is not necessarily an "environmental effect." *Id.* Rather, land-use classifications are the county's expression of how it desires the various areas of the county to develop. Such goals and policies are in the nature of legislative acts that are within the domain of the governing body. *Rochester Ass'n of Neighborhoods,* 268 N.W.2d at 888, 891. Appellant has failed to produce any material evidence that the rezoning of the property may result in an adverse environmental effect.

### C. *Waste–Water Discharge*

■ WTCA argues that the project will result in the discharge of waste-water into adjacent wetlands, which may have the potential for significant environmental effects. Because the project will require an NPDES permit from the MPCA and the waste-water discharge is subject to ongoing regulatory review by the MPCA, the county board concluded in April 2005 that any significant environmental effects from waste-water discharge would be mitigated. *See* Minn. R. 4410.1700, subp. 7.

Because of a decision of this court in an unrelated matter, Jarnot amended the project in August 2005 to eliminate the discharge into the wetlands, and the MPCA then issued a NPDES permit for the project in November 2005. Following a public hearing in which WTCA was given an opportunity to present evidence on the waste-water issue, the county board reaffirmed its decision not to require an EAW.

WTCA argues that anything that occurred after the county board decision in April 2005, which included the amendment to the project to eliminate waste-water discharge into the environment, the NPDES permit, and the subsequent action by the county board in January 2006, is irrelevant and should not be considered. The district court concluded that the record should include all information gathered through January 2006 because the amended plat "contains substantial changes which affect the need for an EAW."

■ We conclude the NPDES permit-application process and subsequent review by the county board in January 2006 were properly considered by the district court for at least three reasons. First, MEQB rules provide that a new EAW is required whenever a RGU has declined a request for an EAW, but before a project has received final approval, if the RGU determines that a substantial change has been made on a project that may have the potential for significant environmental effects. Minn. R. 4410.1000, subp. 5 (2005). The purpose of the rule is to provide for additional review by the RGU to determine if a project, as amended, may result in the potential for significant environmental effects and, therefore, an EAW is required. Here, the additional review of the amended project conducted by the county in January 2006 was not only proper, but it was also required by the rule.

■ Second, the NPDES permit-application process is relevant to consider "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority." Minn. R. 4410.1700, subp. 7. Third, WTCA invited review of evidence gathered after the county board's decision and, therefore, waived its right to object to the consideration of the changes in the project.

■ WTCA also argues that because the NPDES permit is for 110 units, the project is in a mandatory EAW category. An EAW is mandatory for residential developments of more than 100 units. Minn. R. 4410.4300, subp. 19 (2005).

Here, the NPDES permit issued by the MPCA has the upward capacity of 110 residential units. But the county required that the developer, as a condition of the zoning approvals, execute a developer's agreement and a separate agreement limiting the physical capacity of the wastewater treatment facility to no more than 61 residential units. The county has both legally and physically limited the project to 61 residential units. Thus, the project is limited to 61 residential units and is not in the mandatory EAW category.

### D. *Depletion of Water Supply*

■■■ WTCA argues that due to the shallowness of granite bedrock in the area around the development, there is a limited water supply in the existing wells, which will be depleted by the proposed project. At its January 2006 meeting, the county board concluded that the water quantity used by the project will be regulated through a water-appropriation permit issued by the DNR in December 2005.

Here, Jarnot's engineer, North American Wetland Engineering, presented test-pumping data for neighboring wells that showed no adverse impact of the project. Based on the opinion of the DNR hydrologist, the county conditioned approval of the project on Jarnot's commitment to lower the existing wells or connect the wells to the project's water supply. The county noted that future draw-down tests would be required as a condition of plat approval. In short, the county's conclusion that the potential impact of the project on neighboring wells was mitigated by the ongoing regulatory review of the DNR and did not pose the potential for significant environmental effects is supported by the record.

### II.

■■■ WTCA argues that the county's decision to grant Jarnot's application to rezone the property was arbitrary, capricious, and contrary to law. The county argues that this court is procedurally barred from considering WTCA's certiorari appeal on the rezoning of the project. *See Honn v. City of Coon Rapids,* 313 N.W.2d 409, 414 (Minn.1981) (stating that certiorari is not appropriate to review legislative acts). We agree. Parties wishing to challenge legislative decisions by local governmental bodies "must first litigate the question of their validity in district court." *Dead Lake Ass'n, Inc. v. Otter Tail County,* 695 N.W.2d 129, 134 (Minn. 2005).

In *Honn,* the supreme court held that certiorari is not appropriate to review legislative acts in any context and that a governing body's decision to rezone was a legislative act. *Honn,* 313 N.W.2d at 414–15. A subsequent decision of this court held that a person may obtain review of a county board's zoning decision, which is legislative in nature, only by initiating a declaratory-judgment action. *In re Merritt,* 537 N.W.2d 289, 290 (Minn.App.1995). Therefore, this court does not have jurisdiction to hear WTCA's claim that the county's approval of Jarnot's zoning amendment was arbitrary, capricious, and contrary to law. The appeal is dismissed.

### III.

■■■ WTCA next argues that the county's zoning decisions approving Jarnot's revised preliminary and final plat applications with conditions were arbitrary, capricious, and contrary to law. The denial or approval of a preliminary or final plat application is a quasi-judicial administrative decision. *Hurrle v. County of Sherburne,* 594 N.W.2d 246, 249 (Minn. App.1999). When an agency performs a quasi-judicial function, we apply the substantial-evidence test to determine whether the decision is supported by legally

sufficient reasons and factually supported in the record. *Id.* The decision must be supported by substantial evidence on the record, which addresses the requirements of the applicable ordinances. *Id.* at 250. "[W]hen an ordinance specifies minimum standards to which subdivisions must conform, local officials lack discretionary authority to deny approval of a preliminary plat that meets those standards." *PTL, L.L.C. v. Chisago County Bd. of Comm'rs,* 656 N.W.2d 567, 571 (Minn.App.2003).

### A. Inadequate Environmental Review

 WTCA argues that the county's approval of Jarnot's final plat was arbitrary because Minnesota law requires that environmental review be completed before a project may receive final approval from the zoning authority. Respondent argues that the county's zoning approval did not occur until after the petition for an EAW was denied.

Minn.Stat. § 116D.04, subd. 2a(b), provides that when an EAW is completed, the RGU shall publish notice of the completion and allow for a 30–day comment period in order to assess the need for an EIS. Although the statute does not address the denial of an EAW, MEQB rules do. Minn. R. 4410.3100, subp. 1, states that a project may not be started, and final governmental approval may not be given to a project, until there has been a denial of an EAW petition.

Here, the petition for an EAW was denied in April 2005, and that decision was reaffirmed in January 2006. Subsequently, the county granted approval of Jarnot's applications for amended preliminary and final plat. Therefore, there was no violation of the rule.

### B. Inadequate Access Road

 WTCA argues that the final plat approval was arbitrary because there is a substandard access road to the project, and the Benton County Development Code (code) requires all existing roads in the vicinity to be adequate for public safety. The county argues that the section of the code in question does not address the requirements of township access roads outside the subdivision.

 The interpretation of county zoning ordinances is a question of law, which this court reviews de novo. *Buss v. Johnson,* 624 N.W.2d 781, 784 (Minn.App. 2001). "A zoning ordinance should be construed (1) according to the plain and ordinary meaning of its terms, (2) in favor of the property owner, and (3) in light of the ordinance's underlying policy goals." *SuperAmerica Group, Inc. v. City of Little Canada,* 539 N.W.2d 264, 266 (Minn.App. 1995), *review denied* (Minn. Jan. 5, 1996).

Sections 10.11.1 and 10.11.2 of the code,[3] which fall under the hearing of, "Subdivision Design Standards," require that county streets and roads "shall be considered" in relation to, inter alia, "circulation of traffic," "public convenience and safety," and "the proposed uses of the land" to be served by the streets. Here, the board "considered," at length, the issues raised regarding the township road and concluded that the plat met the standards for county streets and roads outlined in the code. On this record, the county did not abuse its discretion by not finding a violation of the code or by conditioning plat approval on improvements to the township road.

WTCA next argues that section 10.13.4

---

**3.** These provisions of the code were formerly numbered sections 10.4.1 and 10.4.2 and

were included in the appendix to respondent's brief.

of the code[4] requires the county board to incorporate the recommendations of the county engineer regarding roads. The record does not contain a recommendation of the county engineer regarding the township road or whether it was unsafe. But the county engineer indicated in his report that the township road was serviceable. Thus, the county's decision not to require improvements to the township road was not arbitrary.

### C. *Failure to Follow "Two–Step" Plat–Approval Process*

 WTCA also argues that the county failed to follow its own ordinance with respect to the proper sequence of plat approvals, i.e., first considering the preliminary plat and then the final plat. Essentially, WTCA argues that the county erred by not allowing the public a sufficient time to review the final plat after approval of the amended preliminary plat.

Section 10.8.1 of the code[5] states:

Approval of a preliminary plat is an acceptance of the general layout as submitted, and indicates that the subdivider may proceed toward final plat approval in accordance with the terms and provisions of this ordinance. However, approval of the preliminary plat in no way assures approval of the final plat.

The above quoted provision does not prohibit approval of a final plat immediately following approval of an amended prelimi-

nary plat. The code contemplates that a final plat review would occur sometime after preliminary plat approval. Here, the original preliminary plat was approved a year in advance of the final plat, and the only significant change on the amended preliminary plat was a redesigned wastewater treatment facility. Numerous hearings were held and large amounts of evidence and data were collected by the county after the original preliminary plat was approved and before final approval of the project as amended. Therefore, WTCA's claim lacks merit.

### DECISION

Because we conclude that the county's decisions not to require an EAW and to approve Jarnot's applications for preliminary and final plat with conditions did not involve an error of law and were supported by substantial evidence, we affirm. Because the county's rezoning of the development property is a legislative act, it is not properly before this court on certiorari, and, therefore, we dismiss that portion of the appeal.

**Affirmed in part; dismissed in part.**

---

**4.** This provision was formerly numbered 10.7.4.

**5.** This provision was formerly numbered 10.5.0.