In the Matter of the Petition for an ENVIRONMENTAL ASSESSMENT WORKSHEET FOR THE 33RD SALE OF STATE METALLIC LEASES IN AITKIN, LAKE, AND SAINT LOUIS COUNTIES, Minnesota.

No. A12–2172.

Court of Appeals of Minnesota.

Sept. 9, 2013.

Review Denied Nov. 26, 2013.

Minnesota Department of Natural Resources Paula Goodman Maccabee, Just Change Law Offices, St. Paul, MN, for relator Matthew Tyler.

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, Jill Schlick Nguyen, Assistant Attorney General, St. Paul, MN, for respondent commissioner of natural resources.

Byron E. Starns, Matthew D. Melewski, Leigh K. Currie, Leonard, Street, & Deinard, P.A., Minneapolis, MN, for interve-

nors DMC (USA) LLC and Encampment Minerals.

John A. Knapp, Thomas H. Boyd, Brent A. Lorentz, Winthrop & Weinstine, P.A., Minneapolis, MN, for amicus Mining-Minnesota.

Considered and decided by WORKE, Presiding Judge; RODENBERG, Judge; and SMITH, Judge.

## OPINION

RODENBERG, Judge.

Relator challenges a decision by respondent Minnesota Department of Natural Resources (DNR) not to require preparation of an environmental assessment worksheet (EAW) in connection with the sale of mineral leases, arguing that the DNR erred when it concluded that the lease sale does not constitute a project and thus does not trigger environmental-review requirements. We affirm.

## FACTS

■ This case arises out of the State of Minnesota's intent to lease its mineral interests in certain real property. A mineral interest encompasses the "right to search for, develop, and remove minerals from land or to receive a royalty based on the production of minerals." *Black's Law Dictionary* 1084 (9th ed.2009). "A mineral interest may be severed from, and exist as a fee interest independent of, a surface estate." *Pillandco, Inc. v. State*, 718 N.W.2d 470, 472 n. 1 (Minn.App.2006) (citing *Wichelman v. Messner*, 250 Minn. 88, 102–03, 83 N.W.2d 800, 814 (1957)). "Severed mineral interests exist in much of

Minnesota and are especially common in northeastern Minnesota." *St. Louis Cnty. v. Fed. Land Bank of St. Paul*, 338 N.W.2d 741, 742 (Minn.1983).

Although most surface and mineral rights are privately held, the state owns some mineral interests. By law, the state retains the mineral rights whenever it conveys real property. Minn.Stat. §§ 16B.286, 93.01 (2012). Thus, when a private party purchases land from the state, a severed estate results in those cases where the state had mineral rights for the parcel. Minn.Stat. §§ 16B.286, 93.01–.04, 94.14 (2012). In those cases, the private party acquires only the surface estate. *Id.*

### *Metallic mineral leasing*

Since 1966, the state has offered leases of its nonferrous metallic mineral interests through public competitive bids known as metallic mineral lease sales.[1] These leases are offered pursuant to the state's public policy to "provide for the diversification of the state's mineral economy through long-term support of mineral exploration, evaluation, environmental research, development, production, and commercialization." Minn.Stat. § 93.001 (2012). Notwithstanding this policy and the offer for lease of more than 120,000 parcels over the 46 years between 1966 and 2012, just under 24,000 parcels—about 20% of those offered—have ever been leased. And an even smaller portion of the land leased by the state has ever been developed for mining. The DNR identifies only 2.4% of the parcels that have been leased as having had any exploratory drilling on them, and has determined that 99% of the parcels

---

1. "Nonferrous" means "[n]ot composed of or containing iron." *American Heritage Dictionary* 1199 (5th ed.2011). Nonferrous metallic minerals include "copper (Cu), nickel (Ni), platinum group metals (PGM—group of 6 metallic elements), titanium (Ti), and gold (Au)."

State, Dep't of Natural Resources, http://www.dnr.state.mn.us/lands_minerals/metallic_nf/leasing.html (last visited Aug. 30, 2013). The leases at issue in this case refer to "metallic minerals" and define that term to exclude iron ores and taconite ores.

leased have had no activity on them beyond the exploration stage.

The DNR is responsible for identifying mining units and holding metallic mineral lease sales; it must give public notice at least 30 days before a lease sale. Minn. Stat. §§ 93.15–.16 (2012); Minn. R. 6125.0500, subp. 1 (2011). After sealed bids are collected and opened publicly, the DNR identifies the highest bidders and proposes leases that must be approved by the state's Executive Council, which comprises the governor, lieutenant governor, secretary of state, state auditor, and attorney general. Minn.Stat. §§ 93.17, subd. 3, .25, subd. 2 (2012). The DNR uses a standardized lease form for all mineral leases, to which we herein refer as "the lease."

Entering into the lease is a first step for a developer considering the mining of state-owned mineral resources. Although the lease grants to the lessee the exclusive rights of exploration, mining, and removal of metallic minerals, the lessee also must obtain permission or approval from the state to engage in most if not all of the activities associated with the exercise of those rights. The lease is "subject to all applicable state and federal statutes, orders, rules and regulations and all operations under this lease shall be conducted in conformity with them." Thus, the lease grants an exclusive right to explore and mine, but only to the extent that such exploration and mining is permitted under applicable law.

### Notice Required Before Exploration

A mineral lease requires the lessee to "advise the [DNR] commissioner, in writing, at least 20 days in advance of any exploration on the leased premises." " 'Exploration' means the act of searching for or investigating a mineral deposit," and "includes examination of an area to determine the quality and quantity of minerals, including obtaining a bulk sample by drilling, excavating, trenching, constructing shafts, ramps, tunnels, pits, and producing refuse and other associated activities." Upon receipt of an exploration plan, "[t]he commissioner may require the lessee to adjust its exploration plans or plans for construction of roads or trails due to special features or uses within the leased premises or due to other natural resource management concerns." If the DNR does not notify the lessee of the need for plan adjustments within 20 days of receipt of the plan, "the lessee may proceed with exploration as described in the submitted exploration plan."

The mineral lease may or may not encompass the surface estate. When the lease does not include the surface estate, the lessee is required to give written notice to the owner of the surface estate at least 20 days before performing any activities that require the use of the surface estate. The written notice also must describe the extent to which the surface estate will be used.

The lessee must comply with the relevant regulations of the DNR and other agencies when conducting exploration activities. *See, e.g.,* Minn.Stat. § 103I.601, subd. 2(a) (2012) (providing that drilling of exploratory borings generally requires a license from the commissioner of health); Minn. R. 4725.0475 (2011) (commissioner's regulation on licensing). The lessee also must "promptly remove all supplies and equipment and must restore the leased premises and roads to a condition satisfactory to the [DNR] commissioner" upon the completion of the exploration activities.

### Permit required for mining

Because state law imposes restrictions on a developer's ability to mine for metallic minerals, developers are required to obtain a permit to mine for metallic minerals.

Minn.Stat. § 93.481 (2012); Minn. R. 6132.0300 (2011). " 'Mining' means the process of removing; stockpiling; processing; storing; transporting, excluding use of common carriers and public transportation systems; and reclaiming a material in connection with the commercial production of metallic minerals." Minn. R. 6132.0100, subp. 18 (2011). And the DNR is required to complete an environmental review before permitting mineral-deposit evaluation or the construction or expansion of a metallic mineral processing facility. *See* Minn. R. 4410.4300, subp. 11(A), (C) (2011) (requiring EAW before most mineral-deposit evaluations and expansions of mining facilities); 4410.4400, subp. 8(A)–(C) (2011) (requiring environmental impact study (EIS) before certain mineral-deposit evaluations and construction of mining facilities may begin).

### Procedural history of this appeal

On July 16, 2012, the DNR issued a notice of intent to hold the state's 33rd sale of metallic mineral leases in October 2012 and subsequently set October 24, 2012 as the date for the sale. It issued a mining unit book identifying the 163 mining units—encompassing a total of approximately 63,859 acres in Aitkin, Lake, and St. Louis Counties—that would be available for lease.

On September 25, relator Matthew Tyler submitted to the Minnesota Environmental Quality Board (EQB) a citizen petition, containing more than 140 signatures, for completion of an EAW before the sale. The EQB referred the petition to the DNR.

The DNR received bids on parcels encompassing only 9,509 acres—about 15% of the total acreage offered. Among the bidders were intervenors DMC (USA) LLC and Encampment Minerals, Inc. The bids were publicly opened on October 24, and the DNR determined that the intervenors had submitted the highest bids on the parcels for which they bid.

On October 30, 2012, the DNR sent letters to owners of surface estates for the parcels on which lease bids had been submitted, informing them of the bidding process, inviting them to submit comments before the bids were presented to the executive council, and advising the owners of surface estates of their right to notice of any planned exploration activities to be conducted under the leases. The letters explained that the lessee would contact landowners if the lessee proposed to "conduct exploration activities affecting your surface ownership. It is possible that they could seek to conduct [exploration activities] within the next several months; however, it may be years before any activity occurs and it is also possible that no activity will occur on [your] specific tracts of land."

On November 8, 2012, the DNR issued an order declining to require preparation of an EAW in connection with the lease sale, concluding that, because the sale of leases does not constitute a "project" within the meaning of the Minnesota rules governing environmental review, an EAW is not required. The DNR explained that it could not "act on the petition because no exploration plan for mineral deposit evaluation has been submitted for review" but indicated that the petition would remain in effect until September 25, 2013 and would apply in the event that a lessee did move forward with exploration plans. Relator filed a petition for certiorari review of the DNR's decision on December 4, 2012.

Having determined not to require an EAW, the DNR proposed 31 mineral leases and recommended them for approval at the executive council's December 6, 2012 meeting. During the meeting, relator's attorney asked the council to delay approving the leases until after resolution of rela-

tor's certiorari appeal. The council voted to table the matter "pending Court of Appeals review with the Council to reconvene to vote on the mineral leases after a decision from the Court."

## ISSUE

Did the DNR err by declining to require an EAW in connection with the lease sale?

## ANALYSIS

■ Final decisions on whether to complete EAWs are appealable to the Minnesota Court of Appeals by petition for writ of certiorari. Minn.Stat. § 116D.04, subd. 10 (2012). We review such decisions to determine whether they are unreasonable, arbitrary, or capricious. *Watab Twp. Citizen Alliance v. Benton Cnty. Bd. of Comm'rs*, 728 N.W.2d 82, 89 (Minn.App. 2007), *review denied* (Minn. May 15, 2007).[2] Notwithstanding this generally deferential standard of review, "[t]he interpretation of statutes and rules and the application of statutes and rules to undisputed facts are both questions of law that we review de novo." *Minnesotans for Responsible Recreation v. Dep't of Natural Res.*, 651 N.W.2d 533, 538 (Minn.App.2002) (hereinafter *MRR* ).

### Framework for environmental review

The necessity for environmental review is governed by rules adopted by the EQB pursuant to the Minnesota Environmental Protection Act (MEPA), Minn.Stat. §§ 116D.01–.11 (2012). *See* Minn.Stat. § 116D.04, subd. 2a(a) (directing board to establish categories for which EAWs and EISs are and are not required). Environmental review is mandatory if a "project" meets certain thresholds articulated in the rules. Minn. R. 4410.4300 (2011) (listing projects requiring an EAW); ·4410.4400 (2011) (listing projects requiring an EIS); Minn. R. 4410.4600 (listing exempt projects). An EAW is also required if material evidence accompanying a petition signed by more than 100 citizens demonstrates that a project has the "potential for significant environmental effects." Minn.Stat. § 116D.04, subd. 2a(c);[3] Minn. R. 4410.1100, subp. 1.

Because the EAW requirement applies to "projects," determining whether an action is a "project" is a threshold issue. In this case, the DNR determined that the sale of mineral leases is not a "project" within the meaning of the statute and rules. Relator challenges that determination.

### Definition of "project" under rules and caselaw

The MEPA does not provide a definition of the term "project," but the rules governing environmental review define a project as "a governmental action, the results of which would cause physical manipulation of the environment, directly or indirectly," and provide that "[t]he determination of whether a project requires environmental documents shall be made by reference to the physical activity to be un-

---

2. In 2011, the legislature amended the Minnesota Statutes to allow persons aggrieved by environmental-review decisions to appeal directly to this court, rather than first appealing to the district court. *See* 2011 Minn. Laws. ch. 4, § 8. This court has historically reviewed challenges to environmental-review decisions "without according deference to the district court's review." *Watab Twp. Citizen Alliance*, 728 N.W.2d at 89. Accordingly, the legisla-

tive amendment allowing for direct appeal does not affect this court's standard of review.

3. The statute references a "proposed action" rather than a project, but the parties agree that the dispositive issue here is whether the sale of the leases is a "project." As noted below, the definitions of "governmental action" and "project" in the statute and rules are circular.

dertaken and not to the governmental process of approving the project." Minn. R. 4410.0200, subp. 65 (2011). "Governmental action" is in turn defined by both the MEPA and the rules as "activities[,] including projects wholly or partially conducted, permitted, assisted, financed, regulated, or approved by [governmental units,] including the federal government." Minn.Stat. § 116D.04, subd. 1a(d); Minn. R. 4410.0200, subp. 33 (2011). As we have previously recognized, the definition of "project" is "somewhat circular." *MRR*, 651 N.W.2d at 539. But we have also observed that, "[d]espite the circularity, both definitions imply that an 'action' or 'activity'—*something more than just planning*—is required before a governmental action or project may be found to exist." *Id.* (emphasis added). Thus, we have held "that a 'project' for purposes of [the MEPA] is a definite, site-specific, action that contemplates on-the-ground environmental changes, including changes in the nature of the use." *Id.* at 540.

Applying this definition in *MRR*, we contrasted the DNR's general system plans for recreation trails in state forests with more definite, site-specific proposed trails, concluding that the former did not constitute projects but that the latter did. *Id.* We also concluded that the general system plans did not constitute projects because they required further approval before they could be implemented. *Id.* We further concluded that, "[e]ven after this approval, many of the proposed trail sites will never be developed because of lack of funding, personnel, or feasibility." *Id.* We then examined whether nine specific trails proposed within the plans constituted projects, and concluded that eight of the trails

were "sufficiently definite" and "site-specific" to be projects subject to environmental-review requirements. *Id.* at 540–41. Thus, in *MRR*, both the definiteness of the location and the maturity of the plans for development were important to determining whether there was a project.

### Whether the sale of mineral leases is a project

■ Applying the *MRR* analysis here, we conclude that the DNR did not act in an arbitrary or capricious manner by determining that the sale of the leases at issue in this case does not constitute a project within the meaning of the MEPA and the environmental-review rules. To the extent that the leases grant exclusive rights to explore for and mine minerals, they also contemplate the possibility of on-the-ground physical changes to the environment. And the leases are somewhat site-specific, designating mining units, each encompassing hundreds of acres, in which mineral exploration and mining may occur in the future. But the contemplated physical changes are indefinite. And the locations of any particular future activities are not ascertainable now because the sites in question cover a vast area. The total acreage available for lease in the October 2012 sale encompasses almost 64,000 acres, and the record does not identify a more definite location within the leased area as a specific site for future exploration.[4] It is also uncertain whether any of the lessees will conduct invasive exploratory activities on the leased sites or whether any mining operations will occur. Whether any such activities take place will depend not only on the intervenors' and other lessees' business decisions to pursue them, but also on

---

4. Relator's petition was filed after the DNR's notice of intent to lease was issued and before bidding ended and the bids were opened. Even if we consider only the 9,509 acres for which bids were received, the record before

us on appeal does not identify any specific sites within that total acreage on which there might be future exploration or what the future exploration activities might be.

their ability to obtain required approvals and permits. Accordingly, the DNR did not err by declining to require preparation of an EAW at this time.

Importantly, and as the DNR acknowledges, environmental review in the form of an EAW or an EIS may be required or within the DNR's discretion to require if and when more definite exploration plans coalesce. The DNR's order states that the present petition for an EAW will remain in effect until September 25, 2013.[5] After that date, affected individuals may submit a new petition for an EAW if they become aware of exploration plans. Moreover, the DNR has a duty to determine whether environmental review is required before approving exploration plans. *See* Minn.Stat. § 116D.04, subd. 1a(d) (defining governmental actions that may require environmental review to include "activities including projects wholly or partially conducted, permitted, assisted, financed, regulated, or *approved by* units of government" (emphasis added)); Minn. R. 4410.0200, subp. 33 (same). In sum, the DNR has not determined—and our decision should not be read to hold—that environmental review will not be required in relation to the leased parcels unless and until the lessees apply for mining permits. Environmental review may be required in relation to exploration plans, depending on the nature and extent of them.

Relator suggests that the lessees do not need to have further government approval before exploring or mining, citing portions of Minnesota Statutes Chapter 93, which reference lessees' rights to enter, prospect, and mine for minerals. Chapter 93 provides for the state's retention of its mineral rights in the event that it sells or transfers real property, i.e., it governs the rights of the state or its lessees vis-à-vis those who purchase land from the state. *See* Minn.Stat. §§ 93.04 ("All minerals in or upon lands which have been or may be sold ... by the state shall remain subject to sale, lease, or contract by the state upon the same terms and conditions as are minerals upon lands belonging to the state; and the state and *all persons claiming under it shall have the right to enter upon these lands and to prospect for, mine, and remove such minerals ....*" (emphasis added)), .05 (allowing lessee the right to enter and prospect for minerals and providing for condemnation of surface rights in certain circumstances).

 We decline to construe chapter 93 to override the requirements, expressed in other portions of the Minnesota Statutes and rules, that lessees obtain permits and that the DNR conduct environmental review before mining operations commence. In this regard, we note that the MEPA is the newer statute and that "[m]ore recent provisions control over conflicting prior provisions." *Ford v. Emerson Elec. Co.,* 430 N.W.2d 198, 201 (Minn.App.1988) (citing *Allen v. Holm,* 243 Minn. 96, 102, 66 N.W.2d 610, 614 (1954)), *review denied* (Minn. Dec. 16, 1988). Moreover, "[w]e interpret a statute, whenever possible, to give effect to all of its provisions; we also read and construe a statute as a whole and interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co., Inc.,* 825 N.W.2d 695, 711 (Minn.2013) (internal quotation omitted); *see also* Minn.Stat. § 645.16(5) (2012) (stating that when the words of a statute are not explicit, the intention of the legislature may be ascertained by considering, among other matters, "other laws upon the same or similar

---

**5.** The November 8, 2012 order allows the petition to remain in effect for almost eleven additional months. But almost all of that time has expired during this appeal.

subjects"); *Milner v. Farmers Ins. Exch.,* 748 N.W.2d 608, 617 (Minn.2008) ("Statutes should be read as a whole with other statutes that address the same subject."). Relator's proffered interpretation of Chapter 93 violates these basic canons of interpretation. Simply stated, the proposed leases, if approved, do not relieve the lessees of the duty to comply with the MEPA and other applicable laws and regulations.

Relator also relies on caselaw from federal courts addressing whether the federal government's entry into gas and oil leases necessitates environmental review under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321, 4331–4335 (2006). These federal cases generally hold that an EIS is required under the NEPA in connection with oil and gas leases that do not reserve to the federal government the ability to preclude surface-disturbing activity. *See, e.g., Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1227 (9th Cir. 1988). Because the government will be unable to preclude such activities later on, the federal courts have reasoned, an EIS must be completed at the leasing stage. *See id.*

We are not bound by these cases. *See, e.g., Simmons v. Fabian,* 743 N.W.2d 281, 294 (Minn.App.2007) (explaining that although opinions of federal courts "are persuasive and should be afforded due deference, we are bound only by decisions of the Minnesota Supreme Court and the United States Supreme Court, even when interpreting federal statutes" (quotation omitted)). Moreover, we do not find them persuasive in the factual circumstances present here. The government's obligation to conduct environmental review under the MEPA is tied to the environmental changes that are contemplated by the government's action. Thus, the proper focus is not on what activity might be allowed to take place under the mineral leases, but on what activity is actually planned. As discussed above, there are no definite, site-specific environmental changes contemplated by the mineral leases. Rather, the leases transfer only the *right* to explore for and mine minerals from the state to the lessees, and future exploration and mining activities remain subject to the MEPA and the rules governing environmental review. Thus, we reject the analysis of the cited cases, which would have the effect of requiring the DNR to conduct environmental review with respect to all parcels offered for lease—including those for which no bid was ultimately received—and to assume that the most extensive and invasive possible exploration activities would be undertaken on those parcels, even though past experience with mineral leases in this state suggests otherwise. *Cf. Park Cnty. Res. Council, Inc. v. United States Dep't of Agric.,* 817 F.2d 609, 623 (10th Cir.1987) (affirming decision not to require EIS in connection with oil and gas lease, explaining that likelihood of development was uncertain and that an "EIS need not be prepared simply because a project is *contemplated,* but only when a project is *proposed*" (quotation omitted)), *overruled on other grounds, Vill. of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir.1992).

## DECISION

The DNR did not err by declining to require completion of an EAW in connection with the sale of metallic mineral leases. Although an EAW and/or an EIS may be required in the future with regard to the exploration and mining of leased parcels, the sale of the lease, without more, does not constitute a project triggering

environmental-review requirements.[6]

**Affirmed.**

**6.** Because we conclude that the DNR did not err by declining to require an EAW in connection with the lease sale, we need not reach intervenors' alternative argument that the leases are an exempt real-estate transaction under Minn. R. 4410.4600, subp. 24(A) (2011).