*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2007**

Whitefish Area Property Owners Association, et al.,
Relators,

vs.

Minnesota-Iowa Baptist Conference,
Respondent,

Crow Wing County Board of Commissioners,
Respondent

**Filed February 17, 2015
Affirmed
Peterson, Judge**

Crow Wing County Board of Commissioners
Resolution 2013-41

John H. Erickson, Brainerd, Minnesota (for relators)

Paul M. Floyd, Wallen-Friedman & Floyd P.A., Minneapolis, Minnesota (for respondent Minnesota-Iowa Baptist Conference)

Jason J. Kuboushek, Iverson Reuvers, LLC, Bloomington, Minnesota (for respondent Crow Wing County Board of Commissioners)

        Considered and decided by Peterson, Presiding Judge; Larkin, Judge; and Klaphake, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**PETERSON**, Judge

In this certiorari appeal challenging a proposed expansion of a church camp, relators argue that (1) respondent-county as the responsible governmental unit (RGU) should have ordered a mandatory or discretionary environmental-assessment worksheet (EAW) for the proposed expansion and (2) the county's determinations are arbitrary and capricious because a county staff member had a conflict of interest. We affirm.

## FACTS

Respondent Minnesota Iowa Baptist Conference operates a church camp on a 145-acre tract of land on Big Trout Lake. After acquiring an adjacent 100-acre tract of land, with shoreline frontage on Arrowhead Lake, the conference submitted an application to amend its 2005 conditional-use permit (CUP) to establish a new camp, Wild Woods Camp, on the Arrowhead Lake property and on a 40-acre tract previously owned by the conference but not developed. The conference requested a permit to construct four housing clusters with five cabins each to house a maximum of 200 children, a dining hall for up to 100 people, rest rooms and a shower house, staff housing for up to 60 people, a boat-and-equipment storage building, and a parking area with luggage depots. The camp would be operated during the summer months and would include a mini-golf course, target ranges, sports fields, a fishing pond, a waterpark, and an equestrian center. The camp's uses of Arrowhead Lake would be limited to canoeing, kayaking, paddleboating, a motorized boat used by a lifeguard, and cane-pole fishing from one or two docks. At the existing Trout Lake camp, the conference proposed constructing a new office

building, converting the existing main office into a multi-function building, and expanding cabins. The conference submitted its application to amend the existing CUP on August 19, 2013.

Relators submitted a request to the Minnesota Environmental Quality Board (EQB) for the preparation of an EAW, relying in part on a 2012 final report by the Minnesota Department of Natural Resources (DNR) that identified parts of the Whitefish Chain of Lakes as sensitive shoreland areas. Relators requested a mandatory EAW based on the permanent conversion of forest land or a discretionary EAW based on the potential for significant environmental effects. Relators identified the following potential environmental effects: (1) conversion of forest land to recreational use; (2) construction of new buildings, a parking area, and other facilities resulting in new impervious surfaces with the potential to cause increased stormwater run-off, erosion, and other detrimental environmental effects; (3) potential detrimental environmental effects from increased wastewater; (4) alterations to County Road 134 to accommodate increased traffic causing increased stormwater run-off and potential noise, dust, and erosion; (5) significant noise resulting from increased motor-vehicle traffic and from camp activities, including outdoor games, a shooting range, public-address systems, and outdoor programs and presentations; (6) significant increase in night-time light pollution in a primarily forested and natural area; and (7) shoreland quality.

The EQB assigned respondent Crow Wing County as the RGU to determine the need for an EAW. The county accepted written comments supporting and opposing the petition for an EAW. County staff calculated the total square footage of the proposed

3

new construction, including the percentages of pervious and impervious surfaces. A county engineer submitted a letter explaining the proposed upgrade of County Road 134. The letter stated that the proposed improvement to County Road 134 included two 11-foot travel lanes with a three-foot shoulder and a reduction of a vertical grade to increase sight distances.

The Crow Wing County Board of Commissioners conducted a hearing on the petition. At the hearing, relator Joseph Christensen expressed concern about the removal of white pines for the parking lot. Witnesses also expressed concern about the camp causing potential damage to wild-rice beds.

The county board denied relators' petition for an EAW. The board found:

> The proposed 100 acre Wildwoods Camp will result in a land use conversion of 15 acres (or 15%) from grassland and forest to infrastructure for the camp. Of the 15 acres, 8 acres (8%) is proposed to be impervious with 7 acres (7%) remaining in open space that will be pervious. The forest has been selectively logged in the past and already has a road, house, garage and an extensive trail system built on it. Proposed construction and programmatic activities are planned to maintain the forested, up-north character of the property. The proposed parking lots will avoid the existing large white pine trees.
>
> The development of the camp will trigger a National Pollutant Discharge Elimination System (NPDES) Permit as part of the federal Clean Water Act which requires a Stormwater Pollution Prevention Plan (SWPPP) to be developed to manage the runoff from a 1" rain event from all new impervious and to ensure that temporary erosion and sediment control best management practices (BMPs) are in place during construction. That 1" standard is the same requirement that the County has for stormwater management. Both the Minnesota Pollution Control Agency (MPCA) and

4

Crow Wing County will enforce the implementation of the SWPPP.

There is no evidence that there will be a significant increase in the use of the lake or shoreline areas of Arrowhead Lake since the existing home on Arrowhead Lake is planned to be maintained as a private residence for the camp director. If the camp uses Arrowhead Lake, it will only be for cane-pole fishing, canoeing, paddle-boating, or other uses that will not disturb the lake's ecosystem. Campers will instead be shuttled across the road to the existing shoreline recreational use areas on Big Trout Lake for swimming and other lake-based activities.

Increased wastewater generated by the camp will be treated by onsite subsurface treatment systems meeting the standards of MN Rules 7080-7083 with permits issued and onsite inspections conducted by the Minnesota Pollution Control Agency since the system will be larger than 10,000 gallons per day. Frequent monitoring will also be conducted after the system is constructed. Furthermore, there is a setback of 100 feet from Arrowhead Lake to any part of a wastewater system as well as a 50 foot setback to any well.

The board's findings also address the issues of additional traffic on County Road 134, increased noise, and night-time lighting. The board noted that the DNR and the rules governing environmental review define sensitive shoreline/shoreland areas differently, that Arrowhead Lake does not meet any of the criteria for a sensitive shoreland area in the rule setting forth the thresholds for environmental review, and that Crow Wing County had not adopted the sensitive shoreland zoning districts proposed by the DNR.

The board denied relators' request for a mandatory or discretionary EAW. This certiorari appeal followed.

5

# DECISION

## I.

A final decision on whether to complete an EAW is appealable to this court by petition for writ of certiorari. Minn. Stat. § 116D.04, subd. 10 (2014). We review an RGU's EAW decision to determine whether it is unreasonable, arbitrary or capricious, or unsupported by substantial evidence. *Watab Twp. Citizen Alliance v. Benton Cnty. Bd. of Comm'rs,* 728 N.W.2d 82, 89 (Minn. App. 2007), *review denied* (Minn. May 15, 2007). "Notwithstanding this generally deferential standard of review, the interpretation of statutes and rules and the application of statutes and rules to undisputed facts are both questions of law that we review de novo." *In re Envtl. Assessment Worksheet for the 33rd Sale of State Metallic Leases,* 838 N.W.2d 212, 216 (Minn. App. 2013) (quotation omitted), *review denied* (Minn. Nov. 26, 2013).

The necessity for environmental review is governed by rules adopted by the EQB pursuant to the Minnesota Environmental Protection Act (MEPA), Minn. Stat. §§ 116D.01–.11 (2014). *See* Minn. Stat. § 116D.04, subd. 2a(a) (directing board to establish categories for which EAWs are and are not required). Environmental review is mandatory if a proposed action meets certain thresholds stated in the rules. Minn. R. 4410.4300 (2013) (listing projects requiring an EAW); Minn. R. 4410.4600 (2013) (listing exempt projects). An EAW is also required if material evidence accompanying a petition signed by more than 100 citizens "demonstrates that, because of the nature or location of a proposed action, there may be potential for significant environmental effects." Minn. Stat. § 116D.04, subd. 2a(c); Minn. R. 4410.1100, subp. 6 (2013).

A.     *Mandatory EAW – Threshold Requirements*

Minn. R. 4410.4300, subp 1, requires an EAW "for projects that meet or exceed the threshold of any of subparts 2 to 37." Relators cite Minn. R. 4410.4300, subp. 28, which applies to "a clearcutting of 80 or more contiguous acres of forest, any part of which is located within a shoreland area and within 100 feet of the ordinary high water mark of the lake or river." There is no evidence that the conference intends to clear cut 80 or more contiguous acres.

Relators also cite Minn. R. 4410.4300, subp. 36, which applies to "golf courses, residential development where the lot size is less than five acres, and other projects resulting in the permanent conversion of 80 or more acres of agricultural, native prairie, forest, or naturally vegetated land." "'Permanent conversion' means a change in use of agricultural, naturally vegetated, or forest lands that impairs the ability to convert the land back to its agricultural, natural, or forest capacity in the future. It does not include changes in management practices, such as conversion to parklands, open space, or natural areas." Minn. R. 4410.0200, subp. 57 (2013).

Relators argue that because Wild Woods intends to use the entire 100 acres, the 80-acre threshold is met. But in determining that an EAW was not required under Minn. R. 4410.4300, subp. 36, the board found that only 15 acres would be converted from grassland and forest to infrastructure for the camp. The board also found:

> The forest has been selectively logged in the past and already has a road, house, garage, and an extensive trail system built on it. Proposed construction and programmatic activities are planned to maintain the forested, up-north character of the

7

property.   The proposed parking lot will avoid the existing large large white pine trees.

Relators cite the number of people who will be using the camp and the many activities planned for the camp but do not cite evidence indicating that the numbers and uses will result in a permanent conversion.  The definition of "permanent conversion" in Minn. R. 4410.0200, subp. 57, supports the board's conclusion that an EAW was not required under Minn. R. 4410.4300, subp 36.

The board did not err in denying relators' request for a mandatory EAW.

**B.**     *Discretionary EAW – Citizens' Petition*

When a request for an EAW is made by citizens' petition, an EAW is required

> if the evidence presented by the petitioners, proposers, and other persons or otherwise known to the RGU demonstrates that, because of the nature or location of the proposed project, the project may have the potential for significant environmental effects. The RGU shall deny the petition if the evidence presented fails to demonstrate the project may have the potential for significant environmental effects. In considering the evidence, the RGU must take into account the factors listed in part 4410.1700, subpart 7.

Minn. R. 4410.1100, subp 6.  Those factors are

> A. type, extent, and reversibility of environmental effects;
> B. cumulative potential effects. The RGU shall consider the following factors: whether the cumulative potential effect is significant; whether the contribution from the project is significant when viewed in connection with other contributions to the cumulative potential effect; the degree to which the project complies with approved mitigation measures specifically designed to address the cumulative potential effect; and the efforts of the proposer to minimize the contributions from the project;

8

C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority. The RGU may rely only on mitigation measures that are specific and that can be reasonably expected to effectively mitigate the identified environmental impacts of the project; and

D. the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, including other EISs.

Minn. R. 4410.1700, subp. 7 (2013).

A petition for an EAW must be supported by "material evidence," meaning "such evidence as is admissible, relevant, and consequential to determine whether the project may have the potential for significant environmental effects." *Watab,* 728 N.W.2d at 90. "Allegations of vague or generalized fears and concerns are therefore not sufficient under the statute." *Id.* Moreover, in determining whether an EAW is warranted, an RGU properly considers "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority." *Id.* (citing Minn. R. 4410.1700, subp. 7 (2005)).

The board addressed each of the environmental concerns raised by relators.

### 1. *Forest Land Conversion*

As already discussed, the board found that only 15 acres would be converted from grassland and forest to infrastructure for the camp. The board also found that (1) the forest has been selectively logged and already has a road, house, garage, and an extensive trail system built on it; (2) proposed construction and programmatic activities are planned

9

to maintain the forested, up-north character of the property, and (3) the proposed parking lot will avoid the existing large white pine trees.

### 2. *Stormwater*

The board found that in accordance with the federal Clean Water Act, an SWPPP will be developed to manage run-off from a one-inch rain event from all new impervious surfaces and to ensure that temporary erosion and sediment control best management practices are in place during construction. Implementation of the SWPPP will be monitored by both the MPCA and Crow Wing County. Relators characterize the board's decision as abandoning the issues raised in their petition to be determined by the planning commission at the CUP stage of the proceeding. But under *Watab*, the board properly considered the extent to which environmental effects are subject to mitigation by ongoing public regulatory authority. 728 N.W.2d at 90.

### 3. *Wastewater*

Relators assert that the project will generate significant wastewater in or adjacent to sensitive shoreland but do not provide evidentiary support for this assertion. There is a 100-foot setback requirement from Arrowhead Lake for any part of a wastewater treatment system. Wastewater will be treated onsite according to MPCA standards, and the system will be monitored frequently.

### 4. *Traffic*

Traffic concerns are addressed by the proposed upgrade to County Road 134. Further, the county engineer stated:

According to data received from Trout Lake Camp, there can be upwards of 400 vehicles making one-time trips to the Camp on Saturdays and Sundays. While this is significant, it creates two peak volumes per week on CR 134 of approximately 600 [Average Daily Traffic (ADT)].

The lowest design ADT breakdown for a [County State Aid Highway] rural reconditioning project is 1 to 750. In that category, according to Minnesota Rules 8820.9926, the minimum recommended standards call for ten foot travel lanes with a one foot shoulder. The next category, for roadways with an ADT of greater than 750, calls for ten foot travel lanes with two foot shoulders. Our proposed design will include eleven foot travel lanes with a three foot shoulder, along with enhanced signing. Another concern raised when meeting with Camp personnel was the increased cross traffic on CR 134 at Trout Lake Drive. While it was previously known that this was a safety issue due to reduced sight distances, this information furthers our proposal to lower the grade of CR 134 to the south and provide adequate sight distances for users of both roadways.

5. *Noise*

All camp housing units will be at least 500 feet from the lake, and buildings will be 50 feet from side-lot property lines. The board found that noise impact would be insignificant because "activities will be located away from the shoreland of Arrowhead Lake, which is where sound tends to carry." The board also noted that "the amount of forest land that will remain as a buffer between the camp and the neighboring landowners will be much greater than existing camps in the area."

6. *Night-Time Lighting*

The board found that "the nearest night-time use areas are located 650 feet away from Arrowhead Lake," "[t]he only light visible from the lake is expected to be from the

11

existing residence already located on the lake[,]" and the camp intends to use downward-facing lights throughout the camp.

7.      *Shoreland Quality*

Relators have not presented evidence showing a potential for negative impact on water quality or habitat. For example, at the public hearing, concerns were raised about potential damage to wild-rice beds. But relators cite no evidence that cane-pole fishing or increased use of Arrowhead Lake by nonmotorized watercraft have any potential to damage wild-rice beds. Relators also raise concerns about animal waste but cite no evidence showing that animal waste generated by the camp may potentially affect water quality.

Although relators have identified environmental concerns, they failed to present evidence that construction of Wild Woods Camp and camp activities may have the potential for significant environmental effects. Construction of the camp and camp activities will have environmental effects. But the evidence does not show any potential that those effects may be significant and is, therefore, insufficient to meet the requirements for a discretionary EAW.

Relators rely on Minn. R. 4410.1100, subps. 2(E) and 5 (2013), to argue that the EQB determined that the petition was supported by material evidence and that the EQB's determination cannot be overridden by the county. Relators misconstrue the rule. Minn. R. 4410.1100, subp. 5, states that, if a petition complies with the requirements of subparts 1 and 2, the EQB's chair shall designate an RGU and forward the petition to the RGU. One of the requirements of subpart 2 is that the petition shall include "material evidence

12

indicating that, because of the nature or location of the proposed project, there may be potential for significant environmental effects." Minn. R. 4410.1100, subp. 2(E). But the fact that the EQB's chair forwarded the petition to the RGU does not mean that the EQB concluded that there may be potential for significant environmental effects; it means only that the EQB determined that the petition included evidence that there may be potential for significant environmental effects. The RGU is responsible for evaluating the evidence and deciding whether to order the preparation of an EAW. The rule states that the RGU shall either (1) order the preparation of an EAW if the evidence presented by the petitioners, proposers, and other persons or otherwise known to the RGU demonstrates that the project may have the potential for significant environmental effects or (2) deny the petition if the evidence fails to demonstrate that the project may have the potential for significant environmental effects. Minn. R. 4410.1100, subp. 6; *see also* Minn. Stat. § 116D.04, subd. 2a(c) (stating that "[a] decision on the need for an environmental assessment worksheet shall be made by the responsible governmental unit").

## II.

A decision is arbitrary and capricious if it reflects the decision-maker's will, rather than its judgment. *In re Valley Branch Watershed Dist.*, 781 N.W.2d 417, 423 (Minn. App. 2010); *see also Chanhassen Chiropractic Ctr., P.A. v. City of Chanhassen*, 663 N.W.2d 559, 562 (Minn. App. 2003) (stating that "constitutional due process protections include the right to an impartial decisionmaker"), *review denied* (Minn. Aug. 5, 2003).

Relators argue that the EAW proceedings were irregular and unfair because county staff member Christopher Pence's position as a member of the board of stewards for respondent Minnesota-Iowa Baptist Conference created a conflict of interest. But the record does not indicate that Pence played an active role in the EAW proceedings. Pence was not present during the initial development review team meetings with the conference regarding the CUP-amendment application, and he disclosed the potential conflict of interest and recused himself from the EAW process according to county policies. Nothing in the record indicates that the board's denial of relators' request for an EAW was influenced by Pence's position on the conference's board.

A decision is arbitrary and capricious when the decision-maker relies on factors not intended by the legislature. *Valley Branch*, 781 N.W.2d at 423. Relators argue that the board improperly considered the number of residential lots that could be developed on the property under the county's zoning ordinance. Relators are correct that the potential residential development was not relevant. But the board noted it only in passing, and the board's decision was based on the criteria stated in the rules for determining whether a mandatory or discretionary EAW is required.

Relators' argument in their reply brief objecting to the conference joining in the county board's brief is without merit. As a respondent in this appeal, the board was a proper party to file a brief defending its decision, and the appellate rules do not prohibit multiple parties from joining in a single brief.

**Affirmed.**

14